920 F.2d 187
 17 U.S.P.Q.2d 1117
 OPTICIANS ASSOCIATION OF AMERICA, a Pennsylvania
Corporation, Appellant,
v.
INDEPENDENT OPTICIANS OF AMERICA, a non-profit corporation
of New Jersey; Robert C. Troast, an individual; Alfred
Villavecchia, an individual; A. Villavecchia & Sons;
Walter H. Neubert, Inc.; B.D. Kovacs, Optician; H.C.
Laird, Optician; Optical Illusion; Robert C. Troast, Guild
Opticians; Gibba Guild Opticians; Arthur L. Wells, Rx
Optician; Kubick & Kubick Eye & Ear; Carl H. Bergelt,
Guild Optician; In Sight Optics; William H. Ackerman,
Optician; Douglas R. Manhire, Opticians; Gerald A. York,
Optician; Saft Guild Opticians; Lawrenceville Optician;
M. Wood, Guild Optician; Lynch-Wood Optician; F. Meserall
& Co., Opticians.
 No. 90-5429.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 11, 1990.
Decided Nov. 29, 1990.
As Amended Dec. 27, 1990.
 
 Joan L. Dillon (argued), Saidman, Sterne, Kessler & Goldstein, Washington, D.C., for appellant.
 Steven B. Pokotilow (argued), Blum & Kaplan, New York City, for appellees.
 Before MANSMANN, COWEN and ALITO, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 Opticians Association of America ("OAA") appeals from an order of the district court denying its request for a preliminary injunction prohibiting the Independent Opticians of America ("IOA") from using certain marks registered by the OAA. 734 F.Supp. 1171. We have jurisdiction over the appeal pursuant to 28 U.S.C. Sec. 1292(a)(1) (Supp.1990). Because the marks at issue were statutorily incontestable, and because the IOA failed to present a suitable defense for its infringement, we will reverse the district court and remand with directions to grant the OAA's motion for preliminary injunction.
 
 I.
 
 2
 In 1925, the Guild of Prescription Opticians of America ("GPOA") was formed as a Pennsylvania corporation. The GPOA's purposes were to represent the interests of its national membership of opticians, and to set optical service standards. A distinguishing feature of the GPOA was the requirement that none of its members be affiliated with refractionists.[1] GPOA members were entitled to use a number of federally registered trademarks ("Guild marks") which came to signify both workmanship of the highest quality and independence from refractionists.[2] Three important changes occurred in 1972 as a result of an organizational restructuring. First, the GPOA changed its name to the OAA. Second, the new OAA dropped the membership prerequisite of non-affiliation in order to broaden its membership base. Lastly, a Guild division ("Guild") was created within the OAA. The Guild was limited to OAA members who were not affiliated with refractionists, as was the original GPOA. Guild members continued to use the Guild marks, while new marks were developed for the OAA's general membership.
 
 
 3
 The Guild marks are federally registered in the collective membership mark, collective trademark, and trademark classifications established by the Trademark Act of 1946, as amended, 15 U.S.C. Secs. 1051-1127 (1976 & Supp.1990) (hereafter "the Lanham Act").[3] They have been used continuously since the registration, and according to the OAA, have served as both collective membership marks and collective trademarks. As required by the Lanham Act, 15 U.S.C. 1065, the OAA filed affidavits of use for each Guild mark between the mark's fifth and sixth years of registered existence. The effect of these filings under the Lanham Act is to make the Guild marks incontestable. 15 U.S.C. 1115(b).[4]
 
 
 4
 To enforce the non-affiliation requirement for membership in the Guild, the OAA mandates that each Guild member sign an affidavit averring absence of an association with refractionists. That affidavit, coupled with timely dues payments, allows an optician to obtain or maintain Guild membership. An investigation and inspection policy was apparently discontinued.
 
 
 5
 A number of Guild members became disenchanted with the enforcement policies of the OAA, thinking them too lax.[5] Worried that many Guild members were, in fact, affiliated with refractionists, and concerned that the quality and independence symbolized by the Guild marks were being compromised as a result of such affiliation, a splinter group broke away from the OAA under the aegis of the New Jersey Guild, an affiliate of the OAA's Guild division. The splinter group continued to use the Guild marks.
 
 
 6
 Faced with this defection, the OAA terminated the affiliation of the New Jersey Guild and the memberships of the opticians and optical firms constituting the splinter group, and ordered them to cease use of the marks by July 3, 1989. The defectors responded by forming the IOA, a non-profit corporation of New Jersey. One of the IOA's first acts was to institute a proceeding before the Trademark Trial and Appeals Board (TTAB) seeking cancellation of the OAA's Guild marks. The IOA also filed an application with the Patent and Trademark Office to register a number of the Guild Marks as certification marks. IOA use of the Guild marks continued past the July 3 deadline.
 
 
 7
 Subsequently, the OAA moved the district court for a preliminary injunction prohibiting the IOA and its individual members from using the Guild marks in the advertising, distribution, or sale of the IOA's goods or services; prohibiting the IOA from tortiously interfering with the OAA; and staying the proceeding for cancellation of the OAA's federal guild mark registrations. The district court denied the motion in its entirety, holding that the Guild marks' federal registrations were invalid. Although the Guild marks were registered as collective marks the district court found that they were in fact used as certification marks by the OAA. This mischaracterization, reasoned the district court, invalidated the registrations, and without valid registrations, the OAA could not demonstrate that injunctive relief was appropriate. This appeal followed.[6]
 
 II.
 
 8
 Whether the district court properly denied the OAA's motion for a preliminary injunction is the issue we decide today. When ruling on such a motion, the district court must consider four factors: "[A] the likelihood that the applicant will prevail on the merits at final hearing; [B] the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; [C] the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and [D] the public interest." Bill Blass, Ltd. v. Saz Corp., 751 F.2d 152, 154 (3d Cir.1984). Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue. ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir.1987). The district court held that because the Guild marks were invalid, there was no reasonable probability that the OAA could succeed on the merits of its claim.
 
 
 9
 In reviewing the district court's denial of the request for injunctive relief, we "cannot reverse unless the trial court has committed an obvious error in applying the law or a serious mistake in considering the proof." Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d 148, 150 (3d Cir.1984). Reversal is warranted in the present case because the district court committed an obvious error in applying the law of trademarks.
 
 III.
 A. Probability of Success
 
 10
 The first prong of the test for preliminary injunctions requires the OAA to show that it will probably prevail at the ultimate trial on the merits. Generally, to win a trademark claim, a plaintiff must establish that (1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services. Pedi-Care, Inc. v. Pedi-A-Care Nursing Inc., 656 F.Supp. 449, 453 (D.N.J.1987); Holiday Inns, Inc. v. Trump, 617 F.Supp. 1443, 1464 (D.N.J.1985).
 
 
 11
 Although the district court held that the Guild marks were invalid, the Lanham Act dictates a different conclusion. Under the Lanham Act, a registered mark becomes "incontestable" upon the filing of an affidavit of use between the fifth and sixth years of that mark's registration. 15 U.S.C. Secs. 1058, 1065. The infringement of an incontestable mark can only be defended on grounds enumerated in the Lanham Act.[7] The importance of incontestability was recently emphasized by the United States Supreme Court. In Park N' Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), the Supreme Court held that a "holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on ... grounds" not provided for in the Lanham Act. Id. at 205, 105 S.Ct. at 667. Thus, the Supreme Court limited "the power of the courts to cancel registrations and 'to otherwise rectify the register' ... to the specific provisions concerning incontestability." Id. at 203, 105 S.Ct. at 666 (quoting 15 U.S.C. Sec. 1119). Reasoning that the "function of the incontestability provisions would be utterly frustrated if the holder of an incontestable mark could not enjoin infringement by others so long as they established that the mark would not be registrable but for its inconstestable status," the Supreme Court noted that the goals of the Lanham Act are promoted by "a conclusion that incontestable status can provide the basis for enforcement of the registrant's exclusive right to use a trade or service mark...." Id. at 198-99, 105 S.Ct. at 663. Accord United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 137 (3d Cir.1981) (cited with approval in Park N' Fly, 469 U.S. at 205, 105 S.Ct. at 667, for the conclusion that a plaintiff may rely on the incontestable status of a trade or service mark in an infringement action).
 
 
 12
 In this case, the OAA filed an affidavit of use between the fifth and sixth year of each mark's registration, making the marks statutorily incontestable. 15 U.S.C. Secs. 1058, 1065. It follows that the IOA can only defend its infringing use of the Guild marks with one of the exceptions to incontestability enumerated in the Lanham Act. The district court held the Guild marks invalid because the OAA allegedly mischaracterized them; that is, used the marks as certification marks despite their registration as collective and other marks. Whether or not the district court's finding in this respect was correct,[8] it is clear that mischaracterization is not one of the enumerated Lanham Act defenses. Therefore, the mere fact that the marks served as certification, rather than collective marks, is insufficient to remove the incontestable status of the Guild marks.[9] In holding otherwise, the district court erred.
 
 
 13
 Undaunted, the IOA argues before us that several of the enumerated defenses are applicable, specifically those provided in sections 14(3) and 14(5) of the Lanham Act. 15 U.S.C. Sec. 1064(3), (5). It is readily apparent, however, that section 14(3) is of no help to the IOA. Section 14(3) provides in part that applications to cancel can be filed at any time, even when a mark has attained the status of inconstestability, where "its registration was obtained ... contrary to the provisions of ... subsection (a), (b), or (c) of Section 1052 of this title...." 15 U.S.C. 1064(3) (emphasis added). In turn, section 2(a) states that a trademark which "consists of or comprises immoral, deceptive, or scandalous matter" shall be refused registration. 15 U.S.C. 1052(a). The IOA claims that the mischaracterization of the Guild Marks constitutes "deception" within the meaning of section 2(a). However, a plain reading of the statute indicates that section 14(3), and by implication, section 2(a), would only apply where the deception occurred during the process of obtaining registration. If any deception occurred in this case, it occurred no earlier than 1972, when the OAA reorganized itself and, in the process, allegedly relaxed Guild standards. This was well after the original registrations. There is no dispute that at the time of the original registrations, the Guild marks were collective in nature.
 
 
 14
 The IOA's attempt to invoke section 14(5) is similarly unavailing. According to section 14(5), a petition to cancel a registration may be filed at any time "in the case of a certification mark on the ground that the registrant (A) does not control, or is not able legitimately to exercise control over, the use of such mark or ... (D) discriminately refuses to certify or to continue to certify the goods or services of any person who maintains the standards or conditions which such mark certifies." 15 U.S.C. 1064(5) (emphasis added). On its face, section 14(5) is inapplicable, since it only applies to certification marks. The Guild marks were not registered as such.
 
 
 15
 Even if we assume arguendo that the district court correctly found the Guild marks to be certification marks by reason of their use, section 14(5) remains inapplicable. The opening paragraph of section 14 establishes that its provisions relate to the cancellation of mark "registrations." Thus, to determine whether section 14(5)'s special protections for certification marks can be utilized by an infringer, extra attention must be paid to the challenged mark's registration. Indeed, section 14 makes no mention that a mark could be characterized either on the basis of its registration or its use. To the contrary, the plain language of section 14 expressly limits its application to situations where a person is damaged by the "registration of a mark." As the Supreme Court has told us, "[n]othing in the legislative history of the Lanham Act supports a departure from the plain language of the statutory provisions concerning incontestability." Park N' Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. at 197-98, 105 S.Ct. at 663.
 
 
 16
 Therefore, it follows that section 14(5) defenses are only available when a challenged mark was registered as a certification mark. The Guild marks were not registered as certification marks, and must therefore be classified according to their actual registrations for the purposes of applying section 14.[10] To reach another conclusion would allow parties to take advantage of section 14(5) by merely alleging that the mark at issue is functioning as a certification mark, thereby emasculating the incontestability provisions governing collective and other marks. See Park N' Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. at 198, 105 S.Ct. at 663.
 
 
 17
 Because the IOA could not successfully raise one of the enumerated Lanham Act defenses, it has failed to remove the Guild marks' incontestable status. The Lanham Act states that the registration of an incontestable mark is conclusive evidence of "the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. Sec. 1115(b). See also Park N' Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. at 196, 105 S.Ct. at 662 ("With respect to incontestable marks ..., Sec. 33(b) provides that registration is conclusive evidence of the registrant's exclusive right to use the mark...."). Since the OAA placed into evidence the Guild marks' registrations, it has established both the validity and the ownership of the marks. As such, the OAA is two-thirds of the way to demonstrating probability of success on the merits.
 
 
 18
 The OAA still must prove, however, that the IOA's use of the Guild marks is likely to create confusion. Likelihood of confusion is a fact normally reviewable under the clearly erroneous standard. American Home Prods. Corp. v. Barr Laboratories, Inc., 834 F.2d 368, 370 (3d Cir.1987). Our review, however, is plenary since there is no dispute as to the facts relevant to this issue.
 
 
 19
 Generally, if the overall impression created by marks is essentially the same, "it is very probable that the marks are confusingly similar." 2 McCarthy, Sec. 23:7. Where the owner of the trademark and the infringer "deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark ... and compare it against the challenged mark." Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir.1983). Proof of actual confusion is not necessary; likelihood is all that need be shown. Fotomat Corp. v. Photo Drive-Thru, Inc., 425 F.Supp. 693, 703 (D.N.J.1977); 15 U.S.C. Sec. 1114(1).
 
 
 20
 Very little analysis is needed in the present case. The IOA's infringement has resulted in concurrent use of the Guild marks by both parties. We have held that "there is a great likelihood of confusion when an infringer uses the exact trademark...." United States Jaycees v. Philadelphia Jaycees, 639 F.2d at 142. Thus, likelihood of confusion is inevitable, when, as in this case, the identical mark is used concurrently by unrelated entities. See also 2 McCarthy, Sec. 23:3 ("Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement.").
 
 
 21
 In short, since statutory incontestability established both the Guild marks' validity and the OAA's ownership, along with the attendant right to exclusive use, and because likelihood of confusion is an inevitable result of the concurrent use of the Guild marks, the OAA has met its burden of showing a probability of success on the merits.
 
 B. Irreparable Injury
 
 22
 Aside from demonstrating probability of success, the OAA must also show irreparable injury. The district court held that the OAA did not meet its burden in this respect, rejecting arguments that the OAA suffered injuries to its good will and reputation, that it was harmed through lost membership, and that the confusion engendered by the IOA's conduct also caused harm. In so holding, the district court clearly erred.
 
 
 23
 Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." Morton v. Beyer, 822 F.2d 364, 372 (3d Cir.1987) (citation omitted). Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will. 2 McCarthy, at Sec. 30:18. In reaching its decision, the district court seemed to find persuasive the argument that despite the infringement, there could be no injury to reputation or good will because the IOA's activities were truer to the ideas the Guild marks stand for than were the OAA's activities. However, the key in these cases is not better use, but rather, lack of control which potentially might result in a damaged reputation. In Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79 (3d Cir.1958), we held that a plaintiff's "mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use...." Id. at 82 (quoting Yale Elec. Corp. v. Robertson, 26 F.2d 972, 974 (2d Cir.1928) (opinion by Judge Learned Hand)). See Pedi-Care, Inc. v. Pedi-A-Care Nursing, Inc., 656 F.Supp. at 457 (D.N.J.1987) (where there is loss of control, "the potential exists that defendant's use of a [mark] confusingly similar to plaintiff's ... mark will result in damage to plaintiff's reputation."); Fotomat Corp. v. Photo Drive-Thru, Inc., 425 F.Supp. at 711 ("Plaintiff's lack of ability to control the nature and quality of services provided under an infringing service mark, even if defendant matches the high quality of plaintiff's services, constitutes irreparable injury."). See also Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir.1982) ("the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the actions of another.") (citation omitted). There is no doubt that the IOA's infringement has inhibited the OAA's ability to control its own Guild marks, which in turn creates the potential for damage to its reputation. Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case. Id.[11]
 
 
 24
 A finding of irreparable injury can also be based on likely confusion. Although we have not expressly decided the issue, many courts have stated that where the plaintiff makes a strong showing of likely confusion, irreparable injury follows as a matter of course. For example, the Court of Appeals for the Second Circuit held that "a preliminary injunction should usually issue when the use of a mark creates a likelihood of confusion.... Our cases clearly say that establishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm." Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 41 (2d Cir.1986). See Hasbro Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir.1988) (a showing of likelihood of confusion "establishes both a likelihood of success on the merits and irreparable harm...."); International Kennel Club, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir.1988) (damages caused by "trademark infringement are by their very nature irreparable") (citation omitted); Home Box Office, Inc. v. Showtime/The Movie Channel, Inc., 832 F.2d 1311, 1314 (2d Cir.1987) (showing a likelihood of confusion establishes the likelihood of success on the merits as well as risk of irreparable harm); General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir.1987) ("Since a trademark represents intangible assets such as reputation and good-will, a showing of irreparable injury can be satisfied if it appears that [plaintiff] can demonstrate a likelihood of consumer confusion."); Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1220 (9th Cir.1987) ("Once the plaintiff in an infringement action has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue."); Arthur Guinness & Sons, PLC v. Sterling Pub. Co., Inc., 732 F.2d 1095, 1099 (2d Cir.1984) ("It is widely recognized that a pirate's use of another's trademark can, without more, establish so substantial a likelihood of confusion among consumers as to warrant a preliminary injunction."). A New Jersey district court restated the rule, noting that " '[p]otential damage which may result from confusion between the parties' [marks] has been deemed to be irreparable injury warranting injunctive relief....' " Pedi-Care, Inc. v. Pedi-A-Care Nursing, Inc., 656 F.Supp. at 457 (quoting Christian Science Bd. of Directors v. Evans, 191 N.J.Super 411, 423, 467 A.2d 268, 275 (Ch.Div.1983)). But see National Bd. of Y.M.C.A. v. Flint Y.M.C.A., 764 F.2d 199, 201 (6th Cir.1985) (refused to adopt a per se rule which deems the requirement of irreparable injury satisfied whenever the plaintiff shows ownership of a registered trademark). We find this authority persuasive. Thus, since we have already held that the concurrent use of the Guild marks by the OAA and the IOA creates the likelihood of confusion, the inescapable conclusion is that there was also irreparable injury. As such, the OAA has met the burden imposed upon it by the second prong of our preliminary injunction analysis.
 
 C. Balancing the Hardships
 
 25
 In deciding whether injunctive relief is appropriate, the third task a trial court must undertake is to balance the hardships to the respective parties. The facts relevant on appeal are not in dispute. A basic purpose behind the balancing analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner. See, e.g., ECRI v. McGraw-Hill, Inc., 809 F.2d at 226. It is likely that the IOA and its members would suffer some economic losses if they are unable to use the Guild marks. For example, IOA opticians could lose income because certain refractionists might refuse to refer patients to non-Guild opticians. Similarly, customers may not wish to frequent non-Guild opticians. A more certain hardship for IOA members to endure would be the costs incurred in replacing promotional items such as stationery, window decals, office signs and the like.
 
 
 26
 But it is equally likely that the OAA will suffer harm should the IOA continue its unrestrained use of the Guild marks. Lost business for its opticians, lost dues, lost membership and possible extinction are all hardships which the OAA could be forced to bear. Aside from the harm, there are several other factors to balance. First, the IOA openly, intentionally, and illegally appropriated the Guild marks, despite being warned not to. By virtue of this recalcitrant behavior, the IOA can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself. See Processed Plastic Co. v. Communications, Inc., 675 F.2d 852, 859 (7th Cir.1982) (after a company intentionally copied a toy car, that company did not suffer hardship because, inter alia, it "cannot now complain that having to mend its ways would be too expensive."); Ideal Indus., Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 1026 (7th Cir.1979) ("One entering a field already occupied by another has a duty to select a trademark that will avoid confusion.... Having adopted [a trademark which causes confusion, defendant] cannot now complain that having to mend its ways will be too expensive."). Second, the Guild marks are not placed on the IOA's primary trade product--eyeglasses. Therefore, while removing the marks from promotional material--a relatively inexpensive process--the IOA can continue the unhindered sale of its product. See Bill Blass, Ltd. v. Saz Corp., 751 F.2d at 156 (finding the defendant was not "irreparably harmed" because it could remove the label from its goods and then sell them). Finally, one of the goals of the preliminary injunction analysis is to maintain the status quo, Guinness & Sons v. Sterling Pub. Co., 732 F.2d at 1099, 1101-02, defined as "the last, peaceable, noncontested status of the parties." 2 McCarthy, Sec. 30:19. Before this controversy began, the Guild marks could only be used by OAA members. Granting an injunction would restore that state of affairs. These considerations, coupled with what, on balance, would seem to be almost equal doses of harm to both parties, lead to the conclusion that the grant of an injunction would impose no greater harm upon the IOA than would be imposed upon the OAA by the denial of an injunction.
 
 D. The Public Interest
 
 27
 The final consideration in our analysis is whether the issuance of a preliminary injunction furthers the public interest. Again, the facts necessary to make this determination are not in dispute.
 
 
 28
 Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused. 2 McCarthy, Sec. 30:21. See Bill Blass, Ltd. v. Saz Corp., 751 F.2d at 156 (there is a public interest in the protection of the trademark and to avoid confusion in the public); SK & F, Co. v. Premo Pharmaceutical Laboratories, 625 F.2d 1055, 1057 (3d Cir.1980) ("preventing deception of the public is itself in the public interest"). See also International Kennel Club v. Mighty Star, Inc., 846 F.2d at 1092 n. 8 (the relevant consideration is the consumer's interest in not being deceived). Having already established that there is a likelihood of consumer confusion created by the concurrent use of the Guild marks, it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon IOA use of the marks would eliminate that confusion.
 
 
 29
 Arguably, OAA use of the Guild marks may also be deceptive and confusing, since at one time those marks represented 100% non-affiliation and now may represent something less. But whether an injunction is granted or denied, the OAA can continue to use the Guild marks as it sees fit. Thus, the issuance of an injunction would eliminate confusion generated by the IOA's infringement, while perhaps perpetuating confusion created by the OAA. On the other hand, to deny injunctive relief would serve no public purpose--both parties would be free to continue confusing customers. This result mandates a finding that not only would the public interest be served by the issuance of an injunction, but it would be best served. As such, the OAA has met the requirements imposed upon parties seeking a preliminary injunction, and is therefore entitled to the relief it seeks.
 
 IV.
 
 30
 Based on the foregoing analysis, we conclude that the district court clearly erred in denying the OAA's motion for a preliminary injunction. We will therefore reverse the district court and remand with instructions that it enter an order preliminarily enjoining the IOA, its individual members, and the remainder of the individual defendants and their representatives, officers, directors, agents, servants, employees, successors, assigns, and those controlled by or acting in concert with them, from using the Guild marks in the advertising, distribution, promotion or sale of goods or services, pending further proceedings.
 
 
 31
 Costs taxed against appellee.
 
 
 
 [1]
 Refractionists are medical professionals who prescribe corrective eyewear. Opticians make and/or sell corrective eyewear, but do not prescribe it
 
 
 [2]
 Non-affiliation represents to the public an optician's freedom from conflicts of interest engendered in serving both the customer and the refractionist. For example, an affiliated optician, eager for referrals from a refractionist, might not be as willing to evaluate independently his customer's needs
 
 
 [3]
 The Lanham Act sets up a system for registering marks. It provides for the registration of trademarks for goods, service marks for services, collective marks denoting membership in an organization, and certification marks certifying that the mark user's products meet the mark registrant's standards. 15 U.S.C. Sec. 1127
 
 
 [4]
 At issue in this case are the following seven marks: United States Trade Mark Registration No. 404,350, registered on November 23, 1943, and renewed for a twenty-year term on November 23, 1983; United States Trade Mark Registration No. 410,748, registered on December 19, 1944, and renewed for a twenty-year term on December 19, 1984; United States Collective Mark Registration No. 622,201, registered on February 28, 1956, and renewed for a twenty-year term; United States Trade Mark Registration No. 622,743, registered on March 6, 1956, and renewed for a twenty-year term; United States Collective Membership Mark Registration No. 751,449, registered on June 18, 1983, and renewed for a twenty-year term on June 18, 1983; United States Collective Membership Mark No. 842,243; and a New Jersey Service mark, registered on July 21, 1983. With the exception of No. 622,743, registered as a Trade Mark, all the marks were registered as collective marks
 
 
 [5]
 The disgruntled Guild opticians were also discouraged by the level of control exercised over the Guild by non-Guild OAA members. That control included the ability to formulate Guild standards, the authority to nominate candidates for the Guild's governing body, and the power to fund the Guild budget. These controls, coupled with the OAA's movement away from its non-affiliation policy, alarmed many long-time Guild members
 
 
 [6]
 The OAA raises neither the issue of whether the district court properly refused to stay the cancellation proceeding before the TTAB, nor the issue of tortious interference, both of which were before the district court by virtue of the OAA's original prayer for relief. We therefore assume for the purposes of this appeal that its arguments with respect to those two issues have been abandoned. As such, the only relief being sought by the OAA in this appeal is an order prohibiting the IOA and its members from using the Guild marks
 
 
 [7]
 The term "incontestable" is obviously somewhat misleading, since there are as many as 21 possible exceptions/defenses to the general rule of inconstestability. Section 33(b) of the Lanham Act, 15 U.S.C. 1115(b) lists eight exceptions to incontestability, and incorporates the exceptions of section 15, 15 U.S.C. 1065. Section 15, in turn, incorporates sections 14(3) and (5) by reference while section 14(3) incorporates the protections in sections 2(a), (b), and (c), and section 4. 2 J. McCarthy, Trademarks and Unfair Competition, Sec. 32:44 (2d ed.1984) (hereafter cited as "McCarthy")
 
 
 [8]
 Although we do not decide today if the district court was correct in this respect, the conclusion that the Guild marks were certification marks is subject to debate. A certification mark is a mark used or intended to be used by a person other than the owner "to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's good or services or that the work or labor on the goods or services was performed by members of a union or other organization." A collective mark is a trademark or service mark used or intended to be used "by the members of a cooperative, an association or other collective group or organization ... and includes marks used to indicate membership in a union, an association or other organization." Id. The Lanham Act definition of collective marks includes two types. The first is the collective membership mark, which is "used by members to indicate that they are members of a union, association or another organization ... They are used to signify membership of an individual." 1 McCarthy, at Sec. 19:34. The second type of collective mark is the collective trade- or service mark, "used only by members of an organization to identify and distinguish their goods or services. The collective organization itself neither sells goods nor performs services under the mark, but may advertise or promote goods or services sold by its members under the mark." Id
 A collective trademark bears a very close resemblance to a certification mark. Id. Thus, it is entirely possible for a collective trademark to legitimately function as a certification mark, or vice versa. That could very well be the case here. If it is, we are still left with the problem of determining whether the Guild marks are collective trademarks or certification marks.
 There are two possible distinctions to make. The first is to give conclusive effect to the mark's original registration. This approach makes sense, because if a collective trademark and a certification mark are indeed virtually identical, there is no rational way to differentiate between the two. Were we to utilize this approach, the Guild marks would be considered collective, since they were registered as such.
 A second distinction is one of form. "[A]s to a collective trade or service mark, the sellers are members of an organization with standards of admission, while as to a certification mark, sellers are not members of an organization, but their products are certified according to set standards." Id. The facts of this case more closely fit the former, and not the latter, definition. All the opticians who sell glasses and use the Guild marks are also members of the OAA, which is an organization with standards of admission. Both distinctions, then, point toward calling the Guild marks collective, contrary to the district court's finding.
 
 
 [9]
 The district court never addressed the issue of whether the IOA presented a Lanham Act defense. Nor did the court discuss the issue of incontestability. In fact, the district court never mentioned the Lanham Act except to define collective and certification marks. Its avoidance of the plain language of the Lanham Act constitutes clear error
 
 
 [10]
 In fact, the OAA tried to register the Guild marks as certification marks, but its attempted registrations were denied
 
 
 [11]
 Contrary to the district court's holding, it is dubious that a monetary value can be attached to loss of membership. Granted, membership dues are easily calculated, but the intangibles the lost members provided are not. One cannot attach a monetary value to ideas former members had for expanding and improving the organization, for example. Perhaps more importantly, the loss of enough members would spell the end for the OAA. Certainly, this is irreparable harm