**In re Lawrence NEIBERG and Phyllis Neiberg, Debtors.**

**BASKIN–ROBBINS INCORPORATED and Baskin–Robbins USA Company, Plaintiffs,**

**v.**

**Lawrence NEIBERG and Phyllis Neiberg, Defendants.**

**Bankruptcy No. 93–22628–BM. Adv. No. 93–2514–BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 9, 1993.

Arthur L. Pressman, Maryam Mahdavi, Abraham, Pressman & Bauer, P.C., Philadelphia, PA, for plaintiffs.

Robert H. Lang, Salamon & Long, Pittsburgh, PA, for defendants.

Kathleen Robb–Singer, Office of United States Trustee, Pittsburgh, PA.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Several matters are before the court. Baskin–Robbins Incorporated and Baskin–Robbins USA Company (collectively "B–R") filed the above-captioned adversary complaint, wherein they seek an injunction prohibiting debtors from using B–R's name or any other similar designation and from otherwise suggesting to the general public an affiliation with B–R. It also seeks to enforce a provision in a franchise agreement in which debtors covenant not to compete with B–R by operating a similar business at the location of the franchise for a period of two (2) years after termination of the franchise agreement.

Debtors oppose the relief sought by B–R. According to debtors, B–R effectively waived its right to terminate the franchise agreement as a result of its conduct subsequent to the alleged date of termination. They assert that the franchise agreement was in effect when the bankruptcy petition was filed and that the franchise is an asset of the bankruptcy estate.

Debtors also have brought what they have designated as a "counter-motion for special relief" in which they seek a mandatory injunction requiring B–R to cooperate with prospective purchasers of their franchise by providing certain specified information.

In accordance with the reasoning set forth below, debtors will be enjoined from holding themselves out as a B–R franchise and from using B–R's name or any other similar designation and from otherwise intimating to the general public an affiliation with B–R.

B–R's request that the covenant not to compete be enforced will be denied, as will debtor's "counter-motion" for a mandatory injunction directing B–R to cooperate with prospective purchasers of the franchise by providing certain information.

–I–

**FACTS**

On November 12, 1990, debtors and B–R executed an agreement ("franchise agreement") whereby debtors were granted a franchise to operate a B–R ice cream parlor at 100 Atwood Street, Pittsburgh, Pennsylvania.

Debtors agreed to purchase from B–R all of their ice cream products; to pay a continuing monthly royalty equal to 0.5 percent of gross sales at that store; and to pay an amount equal to 1.5 percent of monthly gross sales at the store as their contribution to B–R's advertising costs.

The agreement recited that B–R was the sole owner of all right, title, and interest in B–R's proprietary names and marks and the goodwill associated therewith; and that the franchisee had no ownership or proprietary interest therein, except as specifically provided for in the agreement.

The agreement provided that, in the event of default by the franchisee, B–R had the right to terminate the agreement by giving the franchisee written notice of default at least thirty (30) days prior to the effective termination date. The franchisee could avoid termination by satisfactorily curing the default during the thirty-day period.

Debtors agreed that, upon termination of the agreement, they immediately would cease using any proprietary name or mark owned by B–R and would cease to operate the store and would not thereafter represent themselves to the public as a present or former B–R franchisee.

Debtors also covenanted that, upon termination of the agreement, they would not operate a similar business at 100 Atwood Street for at least two (2) years.

In addition to the store at issue, debtors also operate another B–R franchise in another commercial district approximately one (1) mile away. Their other franchise is covered by a separate franchise agreement and is not at issue here. The nearest other B–R franchise is located in still another commercial district approximately four (4) miles from the franchise located at 100 Atwood Street.

Debtors subsequently defaulted on their obligations under the franchise agreement. They failed to pay invoices totalling $13,027.15 for the period from June 4, 1991 through December 28, 1992 for ice cream products supplied by B–R. They also failed to pay monthly royalty and advertising fees in the amount of $4,394.69.

On February 25, 1993, B–R sent written notice to debtors informing them that they were delinquent in the amount of $17,421.84 and demanded payment in full by March 8, 1993. B–R further stated its intention to terminate the franchise agreement unless payment in full had been received by then.

When debtors failed to cure the default by the prescribed date, B–R sent debtors written notice on May 3, 1993 of termination of the franchise agreement. The letter stated that the franchise agreement would terminate in thirty (30) days from debtors' receipt of the notice. B–R demanded payment in full and asserted that termination would not occur if debtors cured the default prior to the effective termination date.

Debtors received the notice of termination on May 10, 1993. They did not cure the default within the prescribed period and continued to operate as a B–R franchise.

On July 19, 1993, B–R sent written notice to debtors informing them that the franchise

agreement had terminated as of June 9, 1993. It demanded that debtors immediately "cease operation of your ice cream store at this location and immediately de-identify your store as a Baskin–Robbins store". B–R stated that it would commence legal action to enforce the terms of the franchise agreement if debtors did not comply by July 29, 1993.

Debtors received the notice on July 22, 1993. Instead of "de-identifying" the store and immediately ceasing operations at that location, debtors filed a voluntary chapter 11 petition on July 28, 1993 at Bankruptcy No. 93–22628–BM. Their counsel sent written notice of the bankruptcy filing to B–R that same day and "reminded" B–R that it was "forbidden from taking any action, including, but not limited to de-identification, with respect to the assets of these Debtors".

Debtors have continued to operate the store as a B–R franchise to the present time. B–R's notice of July 19, 1993 went unheeded.

B–R discontinued supplying debtors at that location with its ice cream products early in 1993. However, it has continued sending debtors certain monthly promotional materials and miscellaneous products. Since then, debtors have brought B–R ice cream products supplied to their other store approximately one mile away to the store located at 100 Atwood Street by private automobile. Debtors have conceded that this practice violates the franchise agreements for both of their stores.

On August 6, 1993, a B–R representative visited the store to see whether it was still operating as a B–R franchise and issued a report concerning its compliance with B–R standards. That same representative visited the store a second time on November 16, 1993 and determined that some of the ice cream products being dispensed were not authorized by B–R; that only fifty percent of B–R's flavors were available; and that one of two ice cream coolers was not in operation. The compressor for that cooler had been out of operation for at least several months.

On November 10, 1993, B–R commenced the above-captioned adversary complaint. The complaint alleges that debtors' continuing conduct is in violation of 15 U.S.C.

§§ 1114(1)(a) and 1125(a)(1); and constitutes unfair competition and an unfair trade practice under the common law. B–R seeks the following relief:

(1) a determination that the franchise agreement pertaining to the store had been effectively terminated;

(2) a permanent injunction prohibiting debtors from continuing to use B–R's name and trademarks or otherwise holding themselves out to the public as being affiliated with B–R; and

(3) enforcement of the covenant not to compete which is contained in the franchise agreement.

On November 10, 1993, B–R also submitted a motion for a preliminary injunction in which they seek the same relief.

Debtors, in their response to the motion, deny that B–R effectively terminated the franchise agreement prior to the filing of the bankruptcy petition. According to debtors, B–R "waived" its termination rights when it continued sending various marketing and advertising materials and miscellaneous supplies to the store subsequent to June 9, 1993.

In addition, debtors have brought a "counter-motion for special relief". According to debtors, B–R has refused to provide prospective purchasers of the disputed franchise with sales and cost analyses. They seek an order directing B–R to provide information to prospective purchasers and to deal with them as it would with a prospective purchaser of any other franchise location.

An emergency evidentiary hearing was held on B–R's motion for injunctive relief and on debtors' "counter-motion" on November 16, 1993. The parties agreed that the hearing held at that time could be consolidated with trial on the merits pursuant to Fed. R.Civ.P. 65(a)(2) and that no further evidentiary hearing was necessary.

–II–

## DISCUSSION

### A) *Did B–R Effectively Terminate The Franchise Agreement?*

Debtors do not seriously dispute that their actions are in violation of 15 U.S.C. §§ 1051

*et seq.*, if B–R effectively terminated the franchise agreement. They deny, however, that B–R effectively terminated it. According to debtors, B–R impliedly waived its right to terminate the franchise agreement when it continued to send certain promotional materials; continued to honor orders for certain miscellaneous supplies and materials; and sent a representative to inspect the store and to prepare a status report.

■ Waiver is a matter of intent. It is the act of intentionally relinquishing or abandoning a known right, claim, or privilege. See *Brown v. City of Pittsburgh,* 409 Pa. 357, 360, 186 A.2d 399, 401 (1962). In order for a legal right to be waived, there must be a **clear, unequivocal, and decisive act** by the party with knowledge of the right and an **evident purpose** to surrender it. *Id.*

■ Waiver may be expressed or implied by law. Implied waiver occurs only if the other party has been **misled, to his detriment,** to honestly believe that relinquishment was intended or consented to by the party having the right. *Id.* Implied waiver applies "only to situations involving circumstances equivalent to an estoppel".[1] The party asserting waiver must show that he was misled and prejudiced thereby. *Id.*

■ Debtors' assertion that B–R impliedly waived its right to terminate the franchise agreement as a result of the above-described conduct is without merit. The overwhelming weight of the evidence compels the conclusion that B–R intended to exercise its right to terminate the franchise agreement and in fact did so.

B–R notified debtors on May 10, 1993 that the franchise agreement would terminate in thirty (30) days unless debtors cured the default. Debtors received notice on July 22, 1993 that the franchise agreement had terminated as of June 9, 1993 and demanded that debtors immediately cease operations as an ice cream store and "de-identify" it was a B–R franchise. Also, B–R did not deliver any

ice cream products to the store after the stated termination date. Ice cream unquestionably was the most important product in debtors' operations. When B–R refused to deliver any more ice cream products to that location, debtors surreptitiously transported ice cream products from their other store, to which B–R continued to deliver ice cream products.

The conduct cited by debtors in support of their claim of waiver is not "clear, unequivocal, and decisive", and does not indicate an "evident purpose" on the part of B–R to relinquish or surrender its right to terminate the franchise agreement. Neither the delivery of promotional materials and miscellaneous products (other than ice cream) nor the subsequent visit and status report by a B–R representative justifies the inference that B–R waived its right to terminate the franchise agreement. The promotional materials and miscellaneous products were delivered as a result of an "administrative snafu". Due to oversight, certain of B–R's departments had not been informed of the termination. A representative of B–R visited the store only to determine whether debtors continued to operate the store at though it were a B–R franchise.

There is an even more compelling reason why debtors' assertion that B–R impliedly waived its right to terminate the franchise agreement must be rejected. Even if it be assumed (for the sake of argument) that B–R's conduct did mislead debtors into reasonably believing that B–R had not exercised its right to terminate the franchise agreement, debtors suffered no prejudice or detriment as a result thereof. To the contrary, debtors **benefitted** therefrom in that they continued to operate the store as a B–R franchise. Any prejudice or detriment that occurred was suffered by B–R. It would be a gross distortion of the law to find implied waiver where the party who relied upon a purportedly misleading act or representation by an-

---

1. Equitable estoppel arises when, by virtue of one's actions, representations, admissions, or silence where one ought to speak out, one induces another party to believe certain facts to exist and that other party rightfully relies and acts on such belief in such a way that they will be prejudiced if one is permitted to deny those facts. One who induces such belief is estopped to deny those facts, to aver a contrary state of facts, or to deny or repudiate their actions or statements. *See Northwestern National Bank v. Commonwealth,* 345 Pa. 192, 196–97, 27 A.2d 20, 23 (1942).

other benefitted as a result thereof while only the party who so misled them suffered a detriment.

**B) *Injunction For Trademark Violation And Unfair Competition.***

B–R asserts that debtors' continued use of the name "Baskin–Robbins" and of its proprietary marks subsequent to the effective termination date is in violation of 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1).

15 U.S.C. § 1114 pertains to trademark infringement. It provides in pertinent part as follows:

(1) Any person who shall, without the consent of the registrant—

(a) Use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising ... in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive....

shall be liable in a civil action by the registrant for the remedies herein after provided.

15 U.S.C. § 1125(a)(1) pertains to unfair competition. It provides in pertinent part as follows:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

■ As a general matter, a plaintiff must demonstrate the following in order to prevail in a trademark action:

(1) that the marks in question are valid and legally protectable;

(2) that the mark is owned by plaintiff; and

(3) that defendant's use of the mark to identify its goods or services is likely to cause confusion in the general public as to the origin of the goods or services.

See *Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990).

■ It is undisputed that the first two requirements have been met in this case. The marks and signs in question are owned by B–R and are valid and legally protected.

The third requirement also has been met in this case. Proof of **actual** confusion is not required. All that need be shown by B–R is the **likelihood** of confusion. See *Opticians,* 920 F.2d at 195. Debtors' continued use of B–R's name and marks after the franchise agreement had terminated provides a sufficient basis for concluding that the third requirement has been met. A likelihood of confusion is "inevitable" when the identical mark is used concurrently by an unrelated entity. Such cases are "open and shut". See *Opticians,* 920 F.2d at 195.

Now that it has been determined that debtors violated 15 U.S.C. §§ 1114(1)(a) and/or 1125(a), the appropriate remedy remains to be determined. 15 U.S.C. § 1116(a) provides as follows:

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under section 1125(a) of this title....

B–R seeks a permanent injunction barring debtors from holding themselves out as a B–R franchise at 100 Atwood Street and from using the name "Baskin–Robbins" and any similar symbol or designation or otherwise suggesting to the general public an affiliation with B–R.

■ A trial court must consider the following factors in determining whether to grant preliminary injunctive relief on a trademark case:

(1) the probability that the moving party will prevail on the merits at final hearing;

(2) the extent to which the moving party is being irreparably harmed by the conduct complained of;

(3) the extent to which the defendant will suffer irreparable harm if an injunction is issued; and

(4) the public interest.

See *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197–98 (3d Cir.1990). All four factors should favor granting injunctive relief before an injunction may be issued. *Opticians*, 920 F.2d at 192.

■ The standard for granting **permanent** injunctive relief is the same as for a temporary injunction, except that the moving party must show actual success, rather than probable success, on the merits. See *Amoco Products Co. v. Gambell*, 480 U.S. 531, 546 n. 2, 107 S.Ct. 1396, 1404 n. 2, 94 L.Ed.2d 542 (1987).

### (1) *Success On The Merits*

It already has been determined that the first requirement has been satisfied. Debtors' continued use of B–R's name, marks, and signs is likely to cause confusion among the general public, in violation of 15 U.S.C. §§ 1114(1)(a) and/or 1125(a).

### (2) *Irreparable Harm To B–R*

■ In order for an injury to be irreparable, it "must be of a peculiar nature, so that compensation in money alone cannot atone for it". *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir.1987).

■ A finding of irreparable injury in a trademark case can be based on loss of control of reputation, loss of trade, and loss of goodwill. *Opticians*, 920 F.2d at 195. It also can be based on a likelihood of confusion. *Opticians*, 920 F.2d at 196–97.

It was determined previously that there is a likelihood of confusion in the general public as a result of debtors' continued use of B–R's name, signs, and symbols subsequent to termination of the franchise agreement. It follows from this that B–R has been irreparably injured as a result.

### (3) *Irreparable Harm To Debtors*

Prohibiting debtors from using B–R's name, signs, and symbols unquestionably will be detrimental to debtors. They will not, however, be heard to protest that they will be irreparably harmed if an injunction is issued. Debtors have openly, intentionally, and illegally continued using B–R's marks, despite B–R's unequivocal demand that they "de-identify" the store as a B–R franchise. Any harm to debtors resulting from an injunction was visited upon them as a result of their own "recalcitrant behavior". See *Opticians*, 920 F.2d at 197.

Moreover, any irreparable harm suffered by debtors as a result of an injunction is outweighed by the irreparable harm which B–R has suffered. Such harm to debtors is substantially ameliorated by the fact that B–R's request that debtors also be enjoined from operating a similar business at 100 Atwood Street for a period of two years will be denied. See II C) *Enforcement Of Covenant Not To Compete.*, *infra*. Debtors may, if they so elect, continue to operate an ice cream store at that location, provided they do so in a manner that is not likely to cause the general public to believe that it is a B–R franchise.

### (4) *The Public Interest*

The public interest in a trademark case is synonymous with the right of the public not to be confused or deceived. *See Bill Blass Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (3d Cir.1984). "Preventing deception of the public is itself in the public interest." *SK & F Co. v. Premo Pharmaceutical Laboratories*, 625 F.2d 1055, 1057 (3d Cir.1980).

It follows *pari passu* from debtors' use of B–R's name, signs, and marks and the resultant likelihood of consumer confusion that debtors' continued use thereof is contrary to the public interest.

In summation, all four factors which are to be considered when determining whether debtors should be permanently enjoined from further use of B–R's name, signs, and marks or otherwise suggesting to the general public an affiliation of their ice cream store with B–R overwhelmingly favor issuance of a permanent injunction.

### C) *Enforcement Of Covenant Not To Compete.*

Paragraph 15.3 of the franchise agreement contains a covenant not to compete. It provides as follows:

15.3 FRANCHISEE further covenants that, except as otherwise approved in writing by BASKIN–ROBBINS, FRANCHISEE shall not, for a continuous and uninterrupted period commencing upon the termination or expiration of this Agreement and continuing for two (2) years thereafter, either directly or indirectly, for itself, or through, on behalf of or in connection with any person, persons, partnership or corporation, own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Store and which is located at the Premises or in the building or group of buildings in which the Premises are located.

B–R seeks to enforce this provision. Its request will be denied for reasons set forth below.

The following requirements must be met in order for a restrictive covenant such as is set forth in paragraph 15.3 to be enforceable.

(1) the covenant must relate either to a contract for the sale of goodwill or other subject property or to a contract for employment;

(2) the covenant must be supported by adequate consideration; and

(3) the covenant must be reasonably limited in both time and territory.

See *Piercing Pagoda, Inc. v. Hoffman,* 465 Pa. 500, 506–07, 351 A.2d 207, 210 (1975).

All of these requirements have been met in this case. A restrictive covenant in a franchise agreement may be enforced by the franchisor. See *Piercing Pagoda,* 465 Pa. at 511, 351 A.2d at 212. Moreover, the covenant was supported by adequate consideration in that B–R granted debtors a franchise in exchange for the covenant. Finally, the covenant is reasonably limited in time and territory. Debtors agreed not to operate a similar business only at that location and only for a period of two years.

A determination that the covenant not to compete is **enforceable** is not the end of the matter. It also must be determined whether it **should** be enforced in this instance.

B–R, in seeking to enforce paragraph 15.3 of the franchise agreement, effectively requests that debtors be permanently enjoined (for a period of two years) from operating an ice cream store at 100 Atwood Street.

The same factors as were considered in connection with B–R's request for an injunction barring debtors from using its name, marks, and sign also must be considered in connection with its request for an injunction barring debtors from operating an ice cream store at the above location for a period of two (2) years. As has been noted, all four factors must favor the granting of injunctive relief before it may be issued. See *Opticians,* 920 F.2d at 192.

### (1) *Success On The Merits*

B–R has demonstrated that the covenant set forth in paragraph 15.3 of the franchise agreement is enforceable. The various requirements for enforcing it have been met.

The covenant will not, however, be enforced in this particular instance because the remaining factors relevant to granting injunctive relief weigh heavily **against** granting such relief.

### (2) *Irreparable Harm To Debtors*

Enforcement of the covenant not to compete undoubtedly would irreparably harm debtors. Prohibiting debtors from operating a similar business at 100 Atwood Street would deprive them of an opportunity to generate income and would seriously jeopardize their prospects for a successful reorganization. The likelihood that debtors' case

will have to be converted to a chapter 7 proceeding will increase considerably if the covenant is enforced.

A chapter 11 debtor should be given a reasonable opportunity to successfully reorganize. The court is unwilling at this early stage of the case to act precipitously, as B–R is asking it to do, thereby scuttling any reorganization, however nascent the prospect of it may be.

### (3) *Irreparable Harm To B–R*

B–R will not suffer irreparable harm if debtors are permitted to operate an ice cream store, but not as a B–R franchise, at 100 Atwood Street.

The nearest B–R franchise is located approximately one mile away and is operated by debtors pursuant to a separate franchise agreement. The next nearest B–R franchise is located approximately four miles away and is operated by someone other than debtors. Both of these stores are located in commercial districts separate and distinct from the commercial district in which the 100 Atwood Street store is located. Traffic into all three stores is almost entirely local. It is highly unlikely that customers who otherwise might be inclined to shop in either of the two B–R franchises will shop instead at a non-B–R ice cream store located at 100 Atwood Street.

In addition, B–R has not established that it intends to grant a B–R franchise to another party in the same commercial area as the store located at 100 Atwood Street. The harm (if any) to B–R is *de minimis.*

### (4) *The Public Interest*

The public interest weighs in this case against enforcing paragraph 15.3 of the franchise agreement. This case has only recently been filed. To date, no unsecured creditors' committee has been appointed and, accordingly, the unsecured creditors are not represented. As has been indicated, debtors' prospects of successfully reorganizing will be significantly diminished if the covenant is enforced. A consequence of its enforcement would be that debtors' general unsecured prepetition creditors will all be adversely affected. Any distribution to them would be

diminished, perhaps substantially. It is in the public interest to maximize, whenever possible, distribution in a bankruptcy case to general unsecured creditors. At the very least, the unsecured creditors' committee must have an opportunity to participate in a proceeding adversely affecting them.

There is still another respect in which the public interest militates against enforcing paragraph 15.3. Schedule G, Executory Contracts And Unexpired Leases, indicates that debtors lease the premises at 100 Atwood Street from a third party and lease the premises for their other franchise from B–R itself. The landlord of the premises located at 100 Atwood Street appeared at the evidentiary hearing on B–R's motion for injunctive relief to express "concern" about B–R's request that the covenant not to compete be enforced. Due to the fact that a hearing was held on an emergency basis, the landlord had little or no opportunity to prepare. Also, the landlord was not provided a meaningful opportunity to participate and to protect his interest because of B–R's objection that he lacked standing to participate in the proceeding.

Although the specifics of the lease for 100 Atwood Street are not of record, it is known that it has not yet expired and will not do so for a considerable period of time. If B–R's request that the covenant not to compete were to be enforced, the landlord would be harmed in that debtors would not be able to generate income at that location with which to meet their obligations under the lease.

In summation, the considerations relevant to the granting of injunctive relief clearly indicate that B–R's request for an injunction to enforce the covenant contained in paragraph 15.3 of the franchise agreement should be denied. Enforcement of the covenant would cause substantial irreparable harm to debtors and would be contrary to the public interest. Moreover, any harm to B–R if it is not enforced is infinitesimal.

### D) *Debtors' Counter–Motion.*

■ Debtors have responded with a "counter-motion" in which they allege that B–R has thwarted their efforts to sell the disputed franchise by rejecting several re-

quests from prospective purchasers to provide them with "ordinary and average sales and costs analyses". According to debtors, B–R's refusal "to provide information and to otherwise cooperate with prospective purchasers is irreparably and substantially diminishing the value of Defendants' Franchise and, therefore, Property of the Estate". Debtors seek a mandatory injunction requiring B–R to "provide any and all reasonable and necessary information to prospective purchasers of Defendants' property and to otherwise deal with prospective purchasers as they would prospective purchasers of any franchise location".

The "counter-motion" will be denied for several reasons. In the first place, debtors have not provided a basis, legal or equitable, that would give this court the authority to issue such a mandatory injunction. We are advised of no duty in this regard owing by B–R to debtor.

Also, debtors' request is predicated on the false premise that B–R had not effectively terminated the franchise agreement and that the franchise is an asset of the bankruptcy estate. As has been indicated, B–R did in fact effectively terminate the franchise agreement prior to the filing of the bankruptcy petition. Accordingly, there is no reason to compel B–R to cooperate with debtors in finding a purchaser for that franchise.

An appropriate order shall be issued.

### ORDER OF COURT

AND NOW at Pittsburgh this 9th day of December, 1993, in accordance with the foregoing Memorandum Opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** as follows:

(1) debtors Lawrence Neiberg and Phyllis Neiberg shall forthwith cease using, in connection with premises located at 100 Atwood Street, Pittsburgh, Pennsylvania 15213, all signs, symbols, slogans, and proprietary marks belonging to plaintiffs Baskin–Robbins Incorporated and/or Baskin–Robbins USA, Co.; debtors also shall not in any way hold themselves out to the general public as present or former franchisees of plaintiffs at that location;

(2) plaintiffs' request that debtors be enjoined, for a period of two (2) years, from occupying or otherwise using said location as an ice cream business is **DENIED;** and

(3) debtors' "counter-motion for special relief" is **DENIED.**

IT IS SO **ORDERED.**