SUNQUEST INFORMATION
SYSTEMS, INC,
Plaintiff,

v.

PARK CITY SOLUTIONS, INC. and
R. Scott Holbrook, Defendants.

No. Civ.A. 00–139J.

United States District Court,
W.D. Pennsylvania.

Aug. 9, 2000.

Brian J. Knipe, Bruce C. Fox, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for plaintiff.

Stanley Yorsz, Matthew F. Burger, Buchanan Ingersoll, Pittsburgh, PA, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

D. BROOKS SMITH, District Judge.

Plaintiff has filed a motion for preliminary injunction in the above-captioned trademark infringement case, seeking an order enjoining defendant, Park City Solutions ("Park City") from using its current corporate logo. Dkt. no. 2. On June 19 and 20, 2000, I conducted an evidentiary hearing on plaintiff's request for injunctive relief. The following memorandum constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). For the following reasons, I will grant plaintiff's motion for a preliminary injunction.

## I. FINDINGS OF FACT

### A. Sunquest and its Business

Plaintiff Sunquest Information Systems ("Sunquest") was formed in September 1979. (6/19 Tr. at 16).[1] Although its principal place of business is in Tuscon, Arizona, Sunquest also has offices in Johnstown, Pennsylvania. *Id.* In fact, Sunquest's co-founder, majority shareholder, and current Chief Executive Officer ("CEO"), Dr. Sidney Goldblatt, currently lives in Pennsylvania. (*Id.* at 17; %₀ Tr. at 23).

Sunquest is in the medical software business. It is one of the two largest software manufacturers in the hospital and health care industry, and it sells software to help hospitals and other entities run their laboratories more efficiently. (6/19 Tr. at 20). Additionally, Sunquest produces pharmacy information systems, radiology information systems, and other software packages that provide health care providers with rules of good practice. *Id.*

Sunquest is also in the consulting business. Through numerous divisions, including its Balanced View division ("Balanced View"), Sunquest specializes in "the extended training of clients." *Id.* at 24. This "extended training" can be broken down into three areas: implementation; integration; and optimization. Implementation is the process of helping clients install their software in accordance with Sunquest's instructions. (6/20 Tr. at 139). Integration involves teaching clients how to make their newly purchased software program interact with other systems or computers that they already use. *Id.* at 140. Optimization is the process of teaching clients how to use all of the functions of their new Sunquest software, and how to use those functions most efficiently. (6/19 Tr. at 25; %₀ Tr. at 140–41). As Sunquest's CEO Dr. Goldblatt explained, clients typically use "less than a fourth,

sometimes even less than one-fifth of the functionality of the product." (6/19 Tr. at 24–25). By teaching clients how to optimize their newly purchased software, Sunquest helps clients take advantage of all that the product has to offer. At present, Sunquest offers implementation, integration, and optimization services on Sunquest products only. (6/20 Tr. at 147).

In addition to implementation, integration, and optimization, Sunquest offers its clients many other services. For instance, the Balanced View division helps clients identify and emulate the "best practices" of other laboratories and hospitals throughout the nation. (6/19 Tr. at 25). Dr. Goldblatt explained this service as follows:

> Sunquest and its laboratory product client base has more than a thousand hospitals and, indeed, most of these are large hospitals, larger than two hundred fifty beds. There may be some particular center of excellence in one or several of those institutions, and other clients would like to be able to emulate that kind of excellent behavior or performance within their operation. Balanced View would act as a conduit for that kind of knowledge, helping clients, in essence, learn from the best of our many clients.

*Id.* Balanced View also offers laboratory compliance audits to ensure that Sunquest's clients comply with federal and state regulations. *Id.* at 27. Finally, it has developed programs that aid hospitals in locating new sources of revenue in the surrounding community. *Id.*

Balanced View is one of Sunquest's fastest growing divisions. In 1999 alone, it generated approximately $10 million of Sunquest's total $138 million in revenues; Balanced View's revenues are expected to double in fiscal year 2000. (*Id.* at 28–29;

---

1. References to testimony at the June 19, 2000 hearing will be cited as "6/19 Tr. at ___." References to testimony at the June 20, 2000 hearing will be cited as "6/20 Tr. at

___." The June 19, 2000 hearing transcript can be found at dkt. no. 18, while the June 20, 2000 hearing transcript is located at dkt. no. 19.

%₀ Tr. at 73). As Dr. Goldblatt explained, Balanced View is "extremely important" to the future of Sunquest's business. (6/19 Tr. at 30). It should come as no surprise, then, that Balanced View's services are "virtually always a part of every proposal to a new client." (*Id.* at 29; %₀ Tr. at 7).

By offering a wide array of exemplary products and services, Sunquest has established an excellent reputation in the medical software industry. (6/19 Tr. at 18, 30–31; %₀ Tr. at 114). According to Sunquest's annual Form 10–K filing for fiscal year 1999, Sunquest's client base includes virtually every hospital and health care provider in the United States. (Def.'s. Ex. F, at 16). It distributes products and services throughout the United States and Europe. (6/19 Tr. at 36). Sunquest's clients include some of the most notable names in the health care industry. *Id.* at 31. Sunquest currently enjoys the largest market share of laboratory information systems clients in the large hospital group, with a forty-three percent share. *Id.* It provides goods and services to all four of the largest commercial laboratories: Quest; Lab Care; Lab Core; and Dynacare. *Id.* at 31–32. Sunquest's clientele includes over one thousand hospitals and approximately two-hundred commercial laboratories. *Id.* at 34. Indicative of its solid reputation throughout the industry is the fact that Sunquest has retained all of its original twenty-five clients. *Id.* at 33. And after twenty-plus years in business, Sunquest has lost only forty-clients, mostly as a result of hospital mergers. *Id.* at 33–34.

Despite Sunquest's excellent reputation, its clients do not purchase its goods and services without hesitation. Sunquest's goods and services are costly, and health care institutions take their time before making such critical purchases. As Dr. Goldblatt explained:

Our sales cycle is a long sales cycle and clients go through a process that actually takes between six and eighteen months. And a major aspect of that process is the development of confidence in the provider of services and products.... I think of it as a confidence-building process and a comfort-building process. And a part of it is to become emotionally involved with all of that information and evidence that would cause the client to finally entrust their institution and, indeed, their reputation and maybe their job, in some instances, on our success with providing service.

(6/20 Tr. at 93).[2] Often the buying process involves a selection committee in which Sunquest deals with upper level executives including, at times, the CEO of the institution. *Id.* at 47, 151. The committee that is charged with making decisions to purchase goods and services almost always negotiates with Sunquest and any of its competitors. *Id.* at 49. These committees "almost always" ask questions about the products or services being offered by Sunquest. *Id.* at 48–49, 151. During these negotiations, Sunquest is given every opportunity to set forth its position and to make its pitch to the committee buying the products and services in question. *Id.* at 50. Attorneys are usually involved in the process, advising these institutions about the written contracts entered into between Sunquest and the health care institution. *Id.* at 48. Indeed, the decision to purchase is often so important to an institution that it will hire an outside consultant to help it determine if it is purchasing the right goods and services. *Id.* at 49.

Although Sunquest's customers go through this lengthy process, they are not particularly sophisticated when it comes to medical software.

**2.** Defendant R. Scott Holbrook distinguished between the length of time that consumers take to purchase "information systems" or software and "services." (6/20 Tr. at 151). "In choosing information systems, it can be

very elongated, as Dr. Goldblatt mentioned. In choosing services though, it—we typically look at a three to six-month decision process to make that. So, it is fairly lengthy." *Id.*

Sunquest's customers are very sophisticated at their professional work. They are very good at doing laboratory analysis. They are very good at medical imaging. They may be very good at managing outstanding pharmacy services, but they rely heavily on special kinds of professionals for information decisions, and they rely very heavily on vendors like Sunquest to provide them with a variety of services.

So, in regard to those areas where they rely on vendors like Sunquest, I would say they are not sophisticated. (6/19 Tr. at 65). In fact, as Dr. Goldblatt noted, a client's decision to buy from Sunquest or one of its competitors is often influenced by numerous intangibles, such as relationships, perception, reputation, quality, and experience. (6/20 Tr. at 50). Despite months of discussions, the decision to purchase often turns on the reputation, history, people, and symbols that distinguish one company from its competitors. *Id.* at 95.

## B. The Sun and Mountains Logo

In 1979 Sunquest adopted as its symbol a stylized sun rising over mountains (the "sun and mountains logo"). (6/19 Tr. at 37; Pl.'s Ex. 3). While not indicative of the nature of the medical software business, the sun and mountains logo was meant to symbolize the company's quest for success in the industry. (6/19 Tr. at 37–38; 6/20 Tr. at 44–45). After using the logo continuously in its marketing and advertising, (6/19 Tr. at 40–42, 44), Sunquest filed an application to register it with the United States Patent and Trademark Office ("PTO"). *Id.* at 47. The application matured into Certificate of Registration No. 1,754,470, dated February 23, 1993. (*Id.;* Pl.'s Ex. 5). Since that time, the sun and mountains logo has been continuously registered. (6/19 Tr. at 47).

The sun and mountains logo is comprised of "a sun emerging from behind two mountains." (Pl.'s Ex. 5). The sky behind the sun and mountains is bordered in the shape of a square with ragged edges or "stippling." (6/20 Tr. at 64; Pl.'s Exs. 3 & 5). Although the mark clearly describes the company's name, "Sunquest," (6/19 Tr. at 38), this name is not a part of the mark registered with the PTO. (Pl.'s Ex. 5). In fact, Sunquest's sun and mountains logo has appeared over the past twenty-one (21) years with and without writing next to it. (6/20 Tr. at 34–37).[3] Color is also not a part of the mark registered with the PTO. (Pl.'s Ex. 5). In the past, the Sunquest logo has appeared in white, orange, blue, gold, brown, beige, and black. (6/19 Tr. at 46 47; 6/20 Tr. at 6, 38, 63, 135). Whenever materials with the sun and mountains

---

**3.** Nevertheless, all of the exhibits introduced at the hearing, with the exception of the trademark application itself, (Pl.'s Exs. 3 & 5), had the names "Sunquest" or "Balanced View" next to the sun and mountains logo.

logo are transmitted by facsimile, the logo will appear, as it does in the trademark registration, in black and white. (6/20 Tr. at 67).

Since adopting its logo in 1979, Sunquest has made continuous and uninterrupted use of it, and has actively advertised and promoted it. (6/19 Tr. at 39, 40–44).[4] Over the years, Sunquest has expended millions of dollars advertising and promoting its mark. (*Id.* at 43–45; 6/20 Tr. at 101; Pl.'s Ex. 4). Sunquest has used its sun and mountains logo in several channels of advertising, including corporate stationery used in correspondence with existing and prospective customers, business cards, pamphlets, travel bags, golf shirts, lapel pins, trade publications, and trade show booths. (6/19 Tr. at 40–42; 6/20 Tr. at 100; Pl.'s Ex. 1). The logo appears on Sunquest's website. (6/19 Tr. at 34–35, 41; Pl.'s Ex. 2). The website is used as a marketing and recruiting tool. (6/19 Tr. at 35–36). Sunquest's logo has also appeared on its software packaging and on computer screens where various versions of Sunquest's software are loaded. (6/20 Tr. at 80, 99–100). Based on this extensive distribution of the sun and mountains logo, Sunquest's customers and prospective customers associate the logo with Sunquest. *Id.* at 106. In fact, Sunquest's logo is easily identifiable to those in the health care information systems market. (6/19 Tr. at 39).[5]

In 1996, Sunquest began to use its sun and mountains logo to promote Balanced View's products and services. (6/20 Tr. at 6–7, 42). Dr. Goldblatt explained this decision during the preliminary injunction hearing:

[W]e viewed the Balanced View Division as the highest level of service offered by the company. As the consulting division of the company, the—usually the most, most experienced people in the installation and in the interfacing and in the product management group have graduated, in essence, to Balanced View.

So, we view that area as being sort of the best and the brightest of the company, and the mark was continued with that group to be emblematic of the excellence of that group. . . .

We discussed at the time the importance of continuing the use of the mark and, indeed, continuing to use the mark for the highest level of service that the company offers.

So, we felt, if anything, it elevated the use of the mark within the company. *Id.* at 6–7. Since 1996, Balanced View has used the sun and mountains logo continuously without interruption. (*Id.* at 6; Pl.'s Ex. 1; Def.'s Exs. Y–Z). As used by Balanced View at present, the sun and mountains logo appears in a single color: gold. (6/20 Tr. at 6, 38).

## C. Park City Solutions Associates Itself With Sunquest

Defendant R. Scott Holbrook ("Holbrook") worked for Sunquest from 1991 to 1996. (6/19 Tr. at 33, 48; 6/20 Tr. at 97–99). When he started at Sunquest he was a senior vice-president of field services. By 1994, he became executive vice president. (6/19 Tr. at 48–49; 6/20 Tr. at 97–98). Soon thereafter, he was promoted to the head of Sunquest's sales and marketing department. (6/19 Tr. at 49; 6/20 Tr. at 98). In that position, Holbrook managed Sunquest's entire sales staff, and was responsible for the preparation of requests for proposals ("RFPs"), the negotiation of all contracts for the sale or licensing of Sunquest's products and services, and the

---

4. Sunquest has previously engaged in efforts to enforce its rights to the sun and mountains logo, and the logo has not previously been successfully infringed. (6/19 Tr. at 46–47).

5. Although three other companies in the health care field use logos that depict a sun and mountains, (Def.'s. Ex. Q, at 133, 146–48), none of these companies produce and service medical software systems. In fact, before Park City came along, Sunquest was the only business in the health care information systems industry to have such an emblem. (6/20 Tr. at 3–4, 87, 91, 119–120).

renewal of existing clients' maintenance agreements. (6/19 Tr. at 49).

Throughout his tenure at Sunquest, Holbrook was familiar with Sunquest's sun and mountains logo. (*Id.* at 50; 6/20 Tr. at 100). During that time, Sunquest displayed the sun and mountains logo in its sales brochures, in other written marketing materials, and at its trade shows. (6/20 Tr. at 99–100). Sunquest employees had logos on their briefcases and on articles of clothing. *Id.* Mr. Holbrook himself used company letterhead and carried business cards and a briefcase with the sun and mountains logo on them. (*Id.;* 6/19 Tr. at 50). Quite simply, the logo was "a part of... very nearly everything he handled in his every day work." (6/19 Tr. at 50; 6/20 Tr. at 100). Holbrook was an active promoter of Sunquest and its corporate logo. (6/19 Tr. at 50).

Two years after he left Sunquest, Holbrook joined with Terry Pitts to form defendant Park City Solutions ("Park City"). (6/20 Tr. at 101). Pitts became the President and Chief Executive Officer ("CEO") of the new company while Holbrook was named its Executive Vice–President. *Id.* at 101–02. They were, at the time of its founding, Park City's only two employees. *Id.* at 101. Park City was set up mainly as a consulting business, and its stated goal has been, and still is, to create the largest health care consulting business in North America. (*Id.* at 17; Pl.'s Ex. 12). At its inception, Park City planned to provide various services to health care institutions and laboratories, including implementation, integration, and optimization services. (6/20 Tr. at 190).

From the start, Park City sought to instill in the minds of its customers that it was closely aligned with Sunquest. For instance, Park City provided implementation, integration, and optimization services on Sunquest products. *Id.* at 122, 190–91. Park City stated that it had core competency in Sunquest products, (6/20 Tr. at 57, 78, 142; Pl.'s Ex. 10), and it referred to Park City's "Sunquest Practice." (6/20 Tr.

at 17–18, 122, 190–91; Pl.'s Ex. 12). In addition, Park City placed on its website biographies of its officers that suggested a link between Sunquest and Park City. (6/19 Tr. at 66–67; Pl.'s Ex. 7). For instance, Mr. Holbrook's biography stated that he was the former Chief Operating Officer ("COO") of Sunquest, and described Sunquest as a leading provider of laboratory-based software. (6/19 Tr. at 67; 6/20 Tr. at 156). Holbrook was never Sunquest's COO. (6/19 Tr. at 67). This attempt to tie Park City to Sunquest in the minds of consumers can also be seen in the order in which the biographies of Pitts and Holbrook were arranged on the Park City website. Although Pitts is the highest ranking official at Park City, for quite some time, Holbrook's biography, with its misrepresentation concerning his Sunquest experience, appeared first on the Park City website. (6/19 Tr. at 67; 6/20 Tr. at 156; Pl.'s Ex. 7). Not until the complaint was filed in this action did Park City reverse the order in which its senior officers' biographies appeared on its website, and remove the inaccurate statement that Holbrook had served as Sunquest's COO. (6/20 Tr. at 145–46, 155–56).

Park City's logo also created the impression that there was some association between Park City and Sunquest. In early 1999, Park City adopted a corporate logo. *Id.* at 102. Holbrook participated in this process. *Id.* The logo adopted by Park City contains a sphere behind some mountains. *Id.* at 66. The overall impression created by the Park City logo is the same overall impression created by the Sunquest logo. Like the Sunquest logo, the dominant feature of the Park City logo is a sphere rising (or setting) over mountains. Like the Sunquest logo, the Park City logo focuses attention on this dominant feature, making characteristics such as the color of the logo appear unimportant. In fact, like the Sunquest logo, the Park City logo has appeared in a number of different colors, including a gray sky with a white sphere and blue mountains, a brown sky with

black mountains, and a gray sky with gray mountains. (6/20 Tr. at 39, 115, 121–122; Def.'s. Ex. AA). Of course, when the logo is transmitted by facsimile, it appears to be gray and black. (6/20 Tr. at 116). A multicolored Park City logo also appears on promotional Kelltech software distribut·ed by Park City. (*Id.* at 132; Def.'s Ex. R).

Despite these similarities, there are two general differences between the Park City and Sunquest logos: Park City's logo is triangular while Sunquest's is square (Def.'s Ex. Y); and Park City's logo always appears with the words "Park City," "Park City Solutions" or "PCS" next to it. (6/20 Tr. at 45, 133).

 P A R K C I T Y S O L U T I O N S

### D. Park City Begins Distributing Its Logo

Park City introduced its logo at the HIMSS trade show in February 1999. (*Id.* at 103–04; Def.'s Ex. CC). Since that time, the logo has appeared on business cards, brochures, product literature, power point presentations, promotional shirts and in numerous places in the Park City website. (6/19 Tr. at 66; 6/20 Tr. at 126, 180, 189; Def.'s Exs. N, T, W, X). Park City's letterhead includes the company's logo. (6/20 Tr. at 181). In fact, the Park City logo is a common symbol for the various different companies purchased by Park City over the past eighteen (18) months. Each company purchased by Park City uses the Park City logo. *Id.* at 178–79. And all of Park City's clients, no doubt, come across Park City's logo when deciding whether to purchase services from the new company.

High-level employees of Sunquest and Balanced View received materials containing the Park City logo more than a year before Sunquest filed this lawsuit. For instance, at the HIMSS trade show in February, 1999, Mr. Holbrook invited Sunquest employees Joe Stumpf, the Chief Managing Officer of the Balanced View division, and Jim Caliendro to the Park City booth where the Park City logo was displayed. *Id.* at 125–26. At that time, Mr. Holbrook distributed his Park City

business card, containing the logo, to both Mr. Stumpf and Mr. Caliendro. (*Id.*; Def.'s Ex. N). At the end of April 1999, Mr. Holbrook presented Dr. Goldblatt, the CEO of Sunquest, with a copy of his Park City business card. (6/20 Tr. at 127–28). That business card contained the Park City logo on it. (Def.'s Ex. N). In early July 1999, Mr. Holbrook and Brent Dover, vice-president of sales and marketing at Park City, each provided Sunquest's President, Mark Emjker, with their business cards that displayed the Park City logo. (6/20 Tr. at 127–28, 196; Def.'s Ex. N). In August 1999, Mr. Stumpf again received materials that contained the Park City logo on them. He received a copy of Mr. Dover's business card and a one-page description of a Park City product that had the Park City logo on it. (6/20 Tr. at 199–200). Finally, in October 1999, Mr. Stumpf received an e-mail from Mr. Dover that contained an attachment with the Park City logo on it. *Id.* at 215.

### E. Park City Emerges As A Sunquest Competitor

Although many Sunquest employees were provided with business cards containing the Park City logo in 1999, Sunquest did not view Park City as a competitive threat until very recently. At the time of the HIMSS show, when Mr. Stumpf and Mr. Caliendro were first provided with business cards, Park City had only three

(3) employees and had not yet completed its acquisition of any of the six (6) companies that it owns at present. (6/20 Tr. at 104, 156–57). Throughout 1999, Dr. Goldblatt, the CEO of Sunquest, understood that Park City was providing a generic list of consulting services, some of which complemented products and services already provided by Sunquest, (6/19 Tr. at 57), but he "did not consider [Park City] a competitor." (6/20 Tr. at 92). In its annual Form 10–K filing for the fiscal year 1999, Sunquest did not list Park City among its competitors. (*Id.* at 45–46, 61–62; Def.'s Ex. F). Even at the end of 1999, Dr. Goldblatt did not consider Park City a competitor because he was unaware of any instances where the two companies had directly competed for business. (6/19 Tr. at 56–57; 6/20 Tr. at 92).

Soon after the HIMSS show, however, Park City began an aggressive campaign to acquire other companies in the health care information systems industry. (6/19 Tr. at 57–58).

In February or March of 1999, Park City bought Healthcare Technologies, Inc. ("HTI"), a company located in Cincinnati, Ohio that provides integration services to clients in the health care industry. (6/20 Tr. at 107). At the time of the acquisition, HTI had between 65 and 70 customers and approximately eighteen (18) employees. *Id.* at 107–08. This acquisition was announced in August 1999. (Pl.'s Ex. 7).

In May 1999, Park City acquired Ameri-Net Computer Technologies ("Amerinet"), a leading provider of implementation and optimization services for IBM AS/400 based applications. (6/20 Tr. at 108; Pl.'s Ex. 7). At the time of the acquisition, Amerinet had 200 customers and approximately twenty-five (25) employees. (6/20 Tr. at 108–09). This acquisition was announced in October 1999. (Pl.'s Ex. 7).

In July or August of 1999, Park City acquired First Choice Consulting ("First Choice"), a leading consulting and services provider to healthcare organizations. (6/19 Tr. at 69–70; 6/20 Tr. at 109; Pl.'s Ex. 7). First Choice provides implementation and upgrading services for patient management and accounting products and clinical processes, including those of Sunquest. (6/19 Tr. at 69–70; 6/20 Tr. at 109). The services offered by First Choice directly compete with and are complementary to those offered by Sunquest. (6/19 Tr. at 71–72). At the time of the acquisition, First Choice had between 65 and 70 employees. (6/20 Tr. at 109). This acquisition was announced in November of 1999. (Pl.'s Ex. 7).

In October 1999, Park City acquired Custom Integration Consultants ("CIC"), a leading provider of integration services to health care institutions. (6/20 Tr. at 108–09; Pl.'s Ex. 7). CIC is located in Las Vegas, Nevada. (6/20 Tr. at 108–09). At the time of the acquisition, CIC had twelve (12) employees and between 50 and 60 customers. *Id.* at 108. Park City announced this acquisition on December 23, 1999. (Pl's Ex. 7).

In December 1999, Park City acquired Chi Laboratory Systems ("Chi Labs"). (6/19 Tr. at 10; 6/20 Tr. at 109; Pl's Ex. 7). Chi Labs is a consulting company based in Ann Arbor Michigan that provides services to various kinds of medical laboratories. (6/20 Tr. at 10–11). Chi Labs provides a number of services that "are directly competitive with Sunquest." *Id.* at 11. Dr. Goldblatt described these services as follows:

> Chi instructs labs in the optimization of their laboratory business. So does Sunquest. Chi helps labs in the rationalization of laboratory services. So does Sunquest. Chi advises labs in dealing with various business problems involved in the labs, such as the reduction of bad debt. So does Sunquest.
>
> So, there are a number of areas in which Chi is directly competitive. Chi does billing for labs and Sunquest is engaged in a number of partnerships to do billing for labs.

*Id.* at 11. At the time of the acquisition, Chi Labs had approximately 60 employees and 800 customers. *Id.* at 110. Park City announced this acquisition on December 18, 1999. (Pl's Ex. 7).

Park City's most recent acquisition is Kelltech. (6/20 Tr. at 11–12, 111). Acquired in March 2000, Kelltech is located in Cleveland, Ohio and provides connectivity and web development services. *Id.* at 12, 111. Kelltech's services are both complementary and competitive to those provided by Sunquest. *Id.* at 12. At the time of the acquisition, Kelltech had twenty-five (25) employees. *Id.* at 111. Park City announced the acquisition at the end of May 2000.

As a result of this string of acquisitions, Park City has emerged as a company with numerous products and services that compete directly with those provided by Sunquest. For instance, Park City has expertise in the implementation, integration, and optimization of Sunquest products and offers services in each of these areas that compete with Sunquest. (6/19 Tr. at 68–69; 6/20 Tr. at 139–141, 147–48). Park City touts its "PCS Sunquest practice," a practice that offers maintenance, implementation, integration, and optimization of Sunquest products to Sunquest's clients. (6/20 Tr. at 17–18, 122, 147; Pl.'s Ex. 12). Additionally, Park City offers services to integrate the various systems found in a health care facility—billing, pharmacy, laboratory, nursing, radiology, and admission, discharge, and transfer ("ADT"). (6/20 Tr. at 15; Pl.'s Ex. 10). With the acquisition of Chi Labs in December 1999, Park City added to its competitive arsenal a number of services that compete directly with those offered by Sunquest. (6/20 Tr. at 11). Finally, Park City offers a product called CLINLab that competes with a new initiative in Sunquest called diagnostics.com. *Id.* at 19.

In recent months, Park City and Sunquest have been in head to head competition at a number of different health care facilities. *Id.* at 18. For instance, at the Gesinger Health System in Pennsylvania, a Park City software product called CLIN-Lab was in direct competition with a product called Axoltol being marketed by Sunquest. *Id.* at 18, 83. In Coshocton, Ohio, Sunquest and Park City competed to install Sunquest software. *Id.* at 84. Park City and Sunquest also competed at the Kaiser Health System in Hawaii, where Park City and Sunquest fought over who would perform a blood bank audit. *Id.* at 85. Finally, the two entities competed for installation and optimization of Sunquest products at thirteen (13) hospitals managed by the Catholic Healthcare West group. *Id.* at 18, 82–85. Park City itself even recognizes that the two companies compete. During the hearing on this matter, defendant Holbrook stated as much, *id.* at 147–48, and acknowledged that the two companies call on many of the same clients. *Id.* at 111–12.

### F. Sunquest Decides To File This Lawsuit

Soon after the beginning of the year 2000, Dr. Goldblatt became aware of just how far Park City had gone in its effort to compete with Sunquest. As Dr. Goldblatt explained, "[i]t was only shortly after the first of the year that I personally became aware of the competitive encounters involving Park City." *Id.* at 92. Between January and March 2000, Dr. Goldblatt learned more about the nature of the competition between Sunquest and Park City. For example, during that time, Goldblatt became concerned that Park City was using Sunquest's proprietary information. (*Id.*; 6/19 Tr. at 58). In late March, 2000, Dr. Goldblatt viewed Park City's website for the first time and examined the Park City logo, which appears in numerous places on the website. (6/19 Tr. at 59, 66; Pl.'s Ex. 7). When Dr. Goldblatt viewed the Park City logo, he had "a visceral and emotional experience that [the Park City logo] was inappropriately similar to [the Sunquest] mark." (6/20 Tr. at 68).

Sunquest immediately hired legal counsel to investigate exactly how Park City

had used its logo and whether Park City had willfully intended to use that logo in an effort to unfairly compete with Sunquest. (6/19 Tr. at 59–61). The entire process lasted approximately two months. *Id.* at 60. According to Dr. Goldblatt, the investigation uncovered a pattern of behavior revealing that Park City was intentionally using its logo to compete unfairly with Sunquest, to dilute the strength of Sunquest's trademark, and to weaken Sunquest's reputation. *Id.* at 61. As a result of this investigation, Sunquest decided to file the instant action against Park City and R. Scott Holbrook. *Id.* In its complaint, Sunquest raised claims for trademark infringement, trademark dilution, unfair competition, misappropriation and disclosure of trade secrets, intentional interference with existing and prospective contractual relations, and breach of contract. Dkt. no. 1. At the same time, Sunquest filed a motion for preliminary injunction. Dkt. no. 2. To expedite the hearing on its request for injunctive relief, Sunquest agreed to limit its request strictly to the trademark issues. It is to the merits of this motion for preliminary injunction that I now turn.

## II. CONCLUSIONS OF LAW

■■ Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988). In deciding whether to grant a request for a preliminary injunction, the district court must consider four (4) factors: (1) a likelihood that the plaintiff will prevail on the merits; (2) the extent to which plaintiff is irreparably harmed by the conduct of the defendant; (3) the extent to which the defendant will suffer irreparable harm if the injunction is issued; and (4) the public interest. *Pappan Enterprises v. Hardee's Food Systems*, 143 F.3d 800, 803 (3d Cir. 1998). All four factors must favor the granting of injunctive relief. *Id.*

## A. Likelihood of Success on the Merits

■ The first factor that a court must consider in deciding whether to grant a preliminary injunction is whether the plaintiff is likely to succeed on the merits of its claim at trial. To make out a claim for trademark infringement under 15 U.S.C. § 1114, Sunquest must establish that (1) the mark in question is valid and legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods and services is likely to create confusion concerning the origin of goods or services. *Opticians Association of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir.1990); *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432, 437 (3d Cir.2000). Because Sunquest's mark is federally registered and has become incontestable, the first two elements of this test are met. *Commerce National*, 214 F.3d at 438.

■ It is the third prong—the likelihood of confusion—that is at issue in this litigation. "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). Likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 (3d Cir.1991); *see also Fisons Horticulture v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir.1994); *Deborah Heart and Lung Center v. Children of the World Foundation, Ltd.*, 99 F.Supp.2d 481, 491 (D.N.J.2000). The plaintiff has the burden of proving the likelihood of confusion and not the mere possibility of confusion. *A & H Sportswear v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 201–06 (3d Cir.1999).

■ The Third Circuit has developed two different standards for determining likelihood of confusion, depending on whether the goods or services that are the subject of the claim directly compete. *Lapp,* 721 F.2d at 462; *A & H Sportswear,* 166 F.3d at 202 (3d Cir.1999).

Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark.

*Lapp,* 721 F.2d at 462. In contrast, when the goods or services are not competing, the court must look at a number of factors to determine whether there is a likelihood of confusion between the two marks. *Id.* at 462–63; *A & H Sportswear,* 166 F.3d at 202; *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir. 1978). The *Scott Paper* factors, as they are called, are as follows: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though non competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of similarity of function; (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market. *Lapp,* 721 F.2d at 463; *Scott Paper,* 589 F.2d at 1229.

■ An initial question I must confront, therefore, is whether the goods and services at issue in this case directly compete. I conclude that they do. Park City offers clients the same kinds of implementation, integration, and optimization services on Sunquest products that Sunquest offers to its own clients. (6/19 Tr. at 68–69; 6/20 Tr. at 139–141, 147–48). With the acquisition of Chi Labs in December 1999, Park City now offers a number of other services that "are directly competitive with Sunquest." (6/20 Tr. at 11). In recent months, Park City and Sunquest have actually had a number of competitive encounters at various hospitals throughout the United States. *Id.* at 18, 82–85. Even Mr. Holbrook, Park City's Executive Vice–President, admitted that Park City and Sunquest compete. *Id.* at 147–48.[6]

■ Having found that the goods and services at issue directly compete, I must "examine the registered mark ... and compare it against the challenged mark.." *Lapp,* 721 F.2d at 462.[7] In comparing the

**6.** When the goods and services at issue directly compete, as they do in this case, the degree of similarity needed to cause likely confusion is less than in cases of dissimilar goods and services. 3 *McCarthy on Trademarks and Unfair Competition* § 24.22 (4th ed.2000); *American Cyanamid Co. v. Nutraceutical Corp.,* 54 F.Supp.2d 379, 387 (D.N.J.1999).

**7.** Under *Lapp,* the court must also determine whether the mark at issue is "inherently distinctive or has acquired sufficient secondary meaning to make it distinctive." *Lapp,* 721 F.2d at 462. Trademark law recognizes five (5) different categories of marks based on their level of inherent distinctiveness. *Fisons Horticulture,* 30 F.3d at 478. These categories are as follows: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. The latter three categories are deemed 'inherently distinctive' and entitled to protection." *Id.* "Arbitrary marks are ones that do not describe any quality or characteristic of the goods or services for which they are used." *Id.* at 478, n. 17. The sun and mountains logo is neither generic, descriptive, or suggestive. In fact, like arbitrary or fanciful marks, the Sunquest mark has absolutely nothing to do with the medical software in-

marks, the appropriate test is not a side-by-side comparison, but whether the marks "create the 'same overall impression' when viewed separately." *Fisons Horticulture*, 30 F.3d at 477, (*quoting Banff, Ltd. v. Federated Department Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988)). This means that the court is obligated to look at the two marks "as a whole rather than simply comparing individual features of the marks." *American Cyanamid Co. v. Nutraceutical Corp.*, 54 F.Supp.2d 379, 387 (D.N.J.1999); 3 *McCarthy on Trademarks and Unfair Competition* § 23:41 (4th ed.2000). Nevertheless, when one feature of a mark is more significant than other features, "it is proper to give greater force and effect to that dominant feature." *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991) (citations omitted); 3 *McCarthy on Trademarks* § 23:42. And "when the dominant portions of the two marks are the same, confusion is likely." *Country Floors*, 930 F.2d at 1065. In the end, however, what all of these rules boil down to is "really nothing more than a subjective 'eyeball' test." 3 *McCarthy on Trademarks* § 23:25 (*quoting J. Wiss & Sons Co. v. Gee Whiz Tool Corp.*, 364 F.2d 910 (6th Cir.1966)).

 I conclude that the two marks, when viewed separately, create the same overall impression. A viewer of the Sunquest logo is drawn to the three (3) dominant features of the mark: the mountains; the orb; and its square frame. Similarly, a viewer of the Park City logo is also drawn to three (3) dominant features: the mountains; the orb; and the triangular frame of the mark. In determining the overall impression created by these two

marks, I give more weight to these dominant features. *See In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1407 (Fed.Cir. 1997). I also find it significant that two (2) of these dominant features are identical. In fact, the only notable difference between the marks, i.e., their frame, is not enough to detract from the overall impression that these marks create. Both marks use their frame to focus the eye on the real message conveyed by the picture: an orb and mountains. Whether one views the ocean through a picture window or a porthole, the overall impression is the same: you have seen a picture of the ocean. Similarly, however these marks are framed, they cannot escape the overall message that they convey: an orb rising over mountains. *See Vogue Co. v. Thompson–Hudson Co.*, 300 F. 509 (6th Cir.1924) (holding that the letter "V" was dominant in two corporate logos and, accordingly, confusion was likely); *Grandpa Pidgeon's of Missouri, Inc. v. Borgsmiller*, 477 F.2d 586, 587 (Cust. & Pat.App.1973) (holding that two pictures of an elderly man created a similar commercial impression and were, therefore, likely to cause confusion).

Park City does not dwell on the overall impression created by these two marks. Instead, it seizes on the details of the marks, and argues that the two are distinct. I doubt the soundness of Park City's approach. As one commentator has noted:

A mark should not be dissected or split up into its component parts and each part then compared with corresponding parts of the conflicting mark to determine the likelihood of confusion. It is the impression that the mark as a whole creates on the average reasonably pru-

dustry or with the goods and services sold by Sunquest. Accordingly, I conclude that the sun and mountains logo is inherently distinctive and entitled to protection. In an effort to undermine Sunquest's claim of strength in its mark, Park City has introduced evidence that third parties use sun and mountains logos. "While other registrations and uses of [the sun and mountains logo] for related products

and services would make the mark less strong if they were in the same market, their use in different markets and for products and services that are not closely related does not necessarily undermine (Sunquest's) claim of strength." *Id.* at 479. With the exception of Sunquest, Park City is the only company in the medical software business that uses a sphere and mountains logo.

dent buyer and not the parts thereof, that is important. As the Supreme Court observed: "The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety."

3 *McCarthy on Trademarks* § 23:41 (*quoting Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 64 L.Ed. 705 (1920)). No doubt a discerning lawyer or calculating consumer could parse these marks until they appear to have little in common, but it is not my charge to perform such "legal surgery." *Grandpa Pidgeon's*, 477 F.2d at 587. It is my job to view these marks as a whole, focusing not on their minor differences but on their overall impression. Nevertheless, I will address whether the differences raised by Park City alter the overall impression of the two marks.[8]

Park City first argues that its logo always appears with a name next to it, either Park City Solutions, Park City, or PCS. As a general rule, the addition of a company's name or "house mark" to an allegedly infringing logo *may or may not* eliminate a likelihood of confusion between the marks at issue. 3 *McCarthy on Trademarks* § 23:43. As one court has explained, "[u]se of differing names ... in connection with similar marks can reduce the likelihood of confusion but don't always do so. ... The issue is properly part of the factual determination ..." *Fuddruckers,*

*Inc. v. Doc's B.R. and Others, Inc.*, 826 F.2d 837, 846, n. 13 (9th Cir.1987). In other words, the use of a trade name "is another element to be considered in determining the likelihood of confusion." 3 *McCarthy on Trademarks* § 23:43 (*quoting Decatur Federal Savings & Loan Association v. Peach State Federal Savings & Loan Association*, 203 U.S.P.Q. 406, 412 (N.D.Ga.1978)). Based on the facts developed at the hearing of this matter, I conclude that placing the Park City name next to the logo neither alters the overall impression created by the logo nor lessens the likelihood that consumers will confuse the logo with Sunquest's.

The addition of the Park City name to the logo at issue does not lessen any confusion experienced by consumers. Park City has been in business for slightly over a year. (6/20 Tr. at 101). No doubt, the name Park City meant little to consumers in the medical software business when the company was first established; the name may still mean little to most consumers today. Consequently, seeing the Park City name next to an orb and mountains logo will not disabuse consumers of any confusion that they might have between Sunquest's and Park City's logos. *See, e.g., Copy Cop, Inc. v. Task Printing, Inc.*, 908 F.Supp. 37, 45 (D.Ma.1995) (holding that the addition of a corporate name lessened but did not eliminate the likelihood of confusion).[9] Apparently, Park City also recognizes that few consumers recognize its name. During 1999 alone, Park City Solutions acquired the following compa-

---

**8.** To the extent that Park City argues that these two marks must be identical in order for there to be a likelihood of confusion, I reject that contention. "Of course, few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Baker v. Master Printers Union*, 34 F.Supp. 808, 811 (D.N.J.1940).

**9.** The cases cited by defendant in support of its claim are easily distinguishable. In both cases, *Worthington Foods, Inc. v. Kellogg Co.,*

732 F.Supp. 1417, 1441–42 (S.D.Ohio 1990) and *Pristine Industries, Inc. v. Hallmark Cards, Inc.*, 753 F.Supp. 140, 145–46 (S.D.N.Y.1990), the names added to the otherwise infringing marks were well known, even famous. *Worthington Foods*, 732 F.Supp. at 1441–42 (addition of the Kellogg's mark lessened the likelihood of confusion); *Pristine Industries*, 753 F.Supp. at 145–46 (addition of the "HALLMARK" name lessened likelihood of confusion). The Park City name is clearly not as well-known in the medical software industry as the Hallmark and Kellogg's marks are in their respective industries.

nies: HTI, Chi Lab, First Choice, Amerinet, CIC, and Kelltech. Rather than rely solely on its name as the unifying force among these companies, Park City also used its logo. Indeed, Park City itself recognizes that placing all of its companies under a common image is more important than placing them under a common name. (6/20 Tr. at 178–79; Pl.'s Ex. 10).

If anything, the addition of the Park City name may actually increase confusion among consumers. As I have found, Park City tried to instill in the minds of consumers that it was affiliated or associated with Sunquest in some way. Park City referred to its "Sunquest Practice," (6/20 Tr. at 17–18, 122, 190–91; Pl.'s Ex. 12), and claimed to have core competency in Sunquest products. (6/20 Tr. at 57, 78, 142; Pl.'s Ex. 10). On its website, it distributed biographies of its officers in a way that suggested a close tie between Sunquest and Park City. (6/19 Tr. at 66–67; Pl.'s Ex. 7). A clear inference springs from these facts: consumers seeing the Park City logo for the first time are likely to conclude that Park City is related in some way to Sunquest. Rather than lessen or eliminate any confusion among consumers, the addition of the Park City name may have increased confusion among consumers. *See, e.g., International Kennel Club of Chicago v. Mighty Star, Inc.,* 846 F.2d 1079, 1088 (7th Cir.1988) (holding that the addition of a "house mark" was a "smoke screen and a poor excuse for the defendant's blatant misappropriation of the plaintiff's name, for even if [consumers] attached any meaning to the defendant's house mark, they would necessarily believe that the [plaintiff] had licensed, approved, or otherwise authorized the defendant's use of the [plaintiff's] name.") (cases cited therein).

Park City next argues that the two marks are dissimilar because the Sunquest logo is usually displayed in orange or gold, while the Park City logo is shown in blue and gray. I reject this argument. First, color is not a part of the mark that Sun-

quest registered with the PTO. (Pl.'s Ex. 5). Over the past twenty (20) years, Sunquest has displayed its mark in various colors, including white, orange, blue, gold, and black. (6/19 Tr. at 46–47; 6/20 Tr. at 6, 38, 63, 135). Whenever materials with the sun and mountains logo are transmitted by facsimile, the logo will appear, as it does in the trademark registration, in black and white. (6/20 Tr. at 67). The Park City logo has also appeared in many different colors, including a gray sky with a white sphere and blue mountains, a brown sky with black mountains, and a gray sky with gray mountains. (6/20 Tr. at 39, 115, 121–122; Def.'s. Ex. AA). Of course, when the logo is faxed, it appears to be gray and black. (6/20 Tr. at 116). Based on these facts, I conclude that the color schemes used by the parties in their logos do not alter the overall impression created by the logos and do not eliminate the likelihood of confusion. *See, e.g., Copy Cop,* 908 F.Supp. at 45 (holding that the different color schemes in two corporate logos did not eliminate the likelihood of confusion).

Unable to demonstrate that the two marks create different overall impressions, Park City takes a different approach, arguing that consumers in the medical software industry are sophisticated and unlikely to be confused by the two logos. "In determining trademark infringement ... everything hinges on whether there is a likelihood of confusion in the mind of an appreciable number of 'reasonably prudent' buyers." *McCarthy on Trademarks* § 23:91. Nevertheless, "[i]f the goods are expensive, the reasonably prudent buyer does not buy casually, but only after careful consideration. Thus, confusion is less likely than where the goods are cheap and bought casually." *Id.* § 23:96; *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1206 (1st Cir.1983) ("[i]f likelihood of confusion exists, it must be based on some person; i.e., a customer or purchaser. And there is always less likelihood of confusion where goods are expensive and pur-

chased after careful consideration."); *Ford Motor Co.*, 930 F.2d at 293 ("some buyer classes, for example ... consumers of very expensive goods, will be held to a higher standard of care than others.").

Park City's argument has a great deal of merit. The products and services sold by Sunquest and Park City are expensive; and the purchasers of these goods and services view their decision as a critical one. Dr. Goldblatt, Sunquest's CEO, described the sales cycle as lasting anywhere between six (6) and eighteen (18) months. (6/20 Tr. at 93). The buying process involves a selection committee that "almost always" asks questions about the products or services being offered. *Id.* at 48–49, 151. In fact, the decision to purchase is often so important to an institution that it will hire an outside consultant to help it determine if it is selecting the right goods and services. *Id.* at 49. Based on these facts, it is unlikely that consumers will be confused about the source of the products or services that they ultimately purchase.

But Sunquest is not seeking to prove that consumers will ultimately purchase goods or services from Park City based on their confusion over the two marks. Rather, Sunquest relies on a different theory to prove its case: initial interest confusion. "Under the theory of initial interest confusion, a sophisticated purchaser of expensive goods or services need not be confused at the time of the actual purchase, but only at the time it is drawn into doing business with the infringer." *ICON Solutions v. IKON Office Solutions, Inc.*, 1998 WL 314672 * 9 (E.D.Pa. June 15, 1998); *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.*, 104 F.Supp.2d 427, 461 (D.N.J.2000); *Acxiom Corporation v. Axiom, Inc.*, 27 F.Supp.2d 478, 497–98 (D.Del.1998). For example, as one commentator has explained:

> [T]he likelihood that a potential purchaser of a specialized computer program may be drawn to the junior user, thinking it was the senior user, is actionable "confusion" even if over the course of

several months of the purchasing decision-making process, the buyer's confusion is dissipated. Such a senior user who is the opposer may suffer injury if a potential purchaser is initially confused between the parties' respective marks in that opposer may be precluded from further consideration by the potential purchaser in reaching his or her buying decision.

3 *McCarthy on Trademarks* § 23:6 (internal quotations omitted). Although the Third Circuit has not directly addressed the issue of initial interest confusion, the doctrine has been embraced by numerous courts, including a number of district courts in this Circuit. *See, e.g., ICON Solutions*, 1998 WL 314672 * 9; *Checkpoint Systems*, 104 F.Supp.2d at 461; *Acxiom Corp.*, 27 F.Supp.2d at 497–98.

The facts in this case support Sunquest's claim of initial interest confusion. For a number of years, Mr. Holbrook actively promoted Sunquest's products and its logo as the head of Sunquest's sales and marketing department. (6/19 Tr. at 50). When Holbrook communicated with Sunquest's customers on company stationery, these customers would see the sun and mountains logo. *Id.* When he visited customers in person, they would see the sun and mountains logo on his briefcase. (*Id.*; 6/20 Tr. at 100). When he handed out business cards or sales literature, these customers would see the sun and mountains logo prominently displayed. (6/19 Tr. at 50; 6/20 Tr. at 99–100). And, at trade shows, Sunquest customers would likely encounter Mr. Holbrook standing at the Sunquest booth, donning a polo shirt with the sun and mountains logo, (6/20 Tr. at 100), with a banner highlighting the Sunquest logo hanging over his head. *Id.* No doubt, during Mr. Holbrook's tenure at Sunquest, many of Sunquest's customers were used to seeing Mr. Holbrook next to the Sunquest logo.

Today, only a few years after leaving Sunquest, Mr. Holbrook is the Executive Vice–President of Park City. Since both

Sunquest and Park City service many of the same customers, (6/20 Tr. at 111–12), Mr. Holbrook is likely to encounter some of the same customers today that he serviced while head of sales and marketing at Sunquest. In speaking with Mr. Holbrook, these customers will learn that Park City performs implementation, integration, and optimization services on Sunquest products. *Id.* at 122, 190–91. They will be told that Park City has core competency in Sunquest products, (6/20 Tr. at 57, 78, 142; Pl.'s Ex. 10), and a "Sunquest Practice." (6/20 Tr. at 17–18, 122, 190–91; Pl.'s Ex. 12). Finally, they will receive a copy of Mr. Holbrook's business card, where there is prominently displayed a logo containing a sphere and mountains. When confronted with the same person, selling the same services, and sporting a similar logo, many of these customers are apt to think, at least initially, that they are dealing with the same company. Based on the evidence presented at the hearing, I conclude that such initial interest confusion is highly likely.[10]

Finally, Park City argues that Sunquest's request for injunctive relief amounts to a "request for complete ownership of every 'sphere and mountains' logo [and] should not be granted." Dkt. no. 20, at 8. In support of this argument, Park City cites *General Foods Corp. v. Ito Yokado Co.*, 219 U.S.P.Q. 822 (Trademark Tr. & App.Bd.1983), a case in which the PTO found no likelihood of confusion between two different bird logos. "[S]hort of concluding that any bird is likely to be confused with any other bird, a proposition

which would, in our view, be unrealistic as a measure of purchasers' perceptions, we see no likelihood that the respective bird designs would be confused." *Id.* at 828.

My conclusion today does not sweep as broadly as Park City suggests. I do not hold that Sunquest has the right to enjoin every sphere and mountains logo in existence, regardless of the manner or industry in which it is used. Rather my decision today is limited to the unique facts of this case. In this case, Park City sought to "gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well-known name." *Philip Morris, Inc. v. Star Tobacco Corp.*, 879 F.Supp. 379, 384 (S.D.N.Y.1995). Repeatedly in its literature and on its website, Park City has tried to create the impression that it is aligned or associated with Sunquest. It calls on many of Sunquest's clients, and offers services that compete directly with Sunquest. Finally, it adopted a mark that creates the same overall impression as that created by the Sunquest sun and mountains logo. Based on these facts, I find that Park City made "every effort to impregnate the atmosphere of [the medical software] market with the drawing power of a congenial symbol." *Id.* In theory, Park City is correct: one sphere and mountains logo is not likely to be confused with another. My conclusion today, however, rests on facts, not theory. And based on the facts in this case, I conclude that consumers are likely to confuse, at least initially, Park City's logo with the one employed by Sunquest.[11]

---

**10.** Park City argues that no witnesses have testified that they were either ultimately or initially confused, but such evidence is not necessary. *Opticians Association,* 920 F.2d at 195 ("[p]roof of actual confusion is not necessary; likelihood is all that is needed."); *Fisons Horticulture,* 30 F.3d at 476 ("while evidence of actual confusion would strengthen plaintiff's case, it is not essential.").

**11.** Although I am not bound to apply the ten (10) *Scott Paper* factors in this case, a cursory review of these factors reinforces my conclusion. *Lapp,* 721 F.2d at 462–63; *Scott Paper.,* 589 F.2d at 1229.

The first two factors—(1) the degree of similarity and (2) the strength of the owner's mark—weigh heavily in favor of a finding of likelihood of confusion. I have already discussed these factors at length. *See supra* at 691–95 (similarity); *supra* at 691 n. 7 (strength of mark).

The third *Scott Paper* factor—(3) price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase—has also been discussed at length. *See supra* at 695–96. Although this factor favors Park City, it does not

Accordingly, I conclude that Sunquest is likely to succeed on the merits of its claim of trademark infringement under 15 U.S.C. § 1114.

### B. Irreparable Harm

 The second prong of the test for a preliminary injunction requires Sunquest to show that it will suffer irreparable harm unless the requested injunction issues. "The requisite feared injury or harm must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). In a trademark case, irreparable injury follows "as a matter of course" once the court has established a likelihood of confusion between the two marks at issue. *Opticians Association*, 920 F.2d at 196–97 ("since we have already held that the concurrent use of the Guild marks by the OAA and the IOA creates the likelihood of confusion, the inescapable conclusion is that there was also irreparable injury."). Because I have found a likelihood of confusion exists, I also conclude that Sunquest will suffer irreparable harm unless an injunction issues in this case.[12]

Park City argues that Sunquest does not suffer from irreparable harm because it delayed more than a year in enforcing its rights to the sun and mountains logo. A plaintiff's delay in enforcing its rights under the trademark law is generally relevant to two issues: laches and irreparable harm.

 Laches is an equitable doctrine that consists of two essential elements: (1) inexcusable delay in bringing suit; and (2) prejudice to the defendant resulting from such delay. *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040, 1044 (3d Cir.1982). When a plaintiff's delay is so "unreasonable and inexcusable as to constitute a virtual abandonment of its right," the plaintiff can be barred from all relief against the infringing defendant. *Id.* More common are those cases in which the plaintiff's conduct meets the two part test noted above, but it is not "egregious." *Id.* In these cases, "the plaintiff's less egregious delay will bar its claim for an accounting for past infringement but not for prospective injunctive relief." *Id.* In the instant case, Park City cannot establish a claim of laches. First, there is no

---

foreclose a finding of initial interest confusion. *Id.*

The fourth and sixth factors—(4) the length of time the defendant has used the mark without evidence of actual confusion and (6) evidence of actual confusion—favor neither Park City nor Sunquest. Sunquest did not present any evidence of actual confusion in this case, but such evidence is not necessary. *Opticians Association*, 920 F.2d at 195. In addition, the cases cited by Park City concerning these factors are clearly distinguishable. For example, in *Barre–National, Inc. v. Barr Laboratories, Inc.*, 773 F.Supp. 735, 744 (D.N.J.1991), the two marks existed for seventeen (17) years without any evidence of actual confusion. In the instant case, the Park City and Sunquest marks have existed together for a little over a year. In an industry where it takes between six (6) and eighteen (18) months to complete a sale, (6/20 Tr. at 93), it is simply not surprising that there is little evidence of actual confusion at this point in the game.

The fifth factor—the defendant's intent—weighs heavily in favor of a finding of likelihood of confusion. *Checkpoint Systems*, 104

F.Supp.2d at 464–65. I have concluded that Park City sought to associate itself with Sunquest in the minds of consumers. One part of this effort was the adoption of the Park City logo.

The final four (4) factors deal with whether the two entities compete or not. Because I have concluded that Sunquest and Park City compete, *see supra* at 691–92, I also conclude that factors seven (7) through ten (10) weigh in favor of a likelihood of confusion in this case.

In sum, the *Scott Paper* factors weigh in favor of a finding of likely confusion between the two marks at issue in this case.

12. In a trademark case, irreparable harm also can be established by a finding that the plaintiff will lose control over its reputation due to the defendant's infringement. *Opticians Association*, 920 F.2d at 195. There is substantial evidence in the record of this case to support a finding of irreparable harm on this independent basis. (6/19 Tr. at 62–65; 6/20 Tr. at 95).

evidence in the record that Sunquest engaged in the kind of egregious conduct that would bar all of its efforts to seek relief against Park City. *University of Pittsburgh*, 686 F.2d at 1044. Second, even if Sunquest did engage in "less egregious" activity, which I doubt, such conduct does not bar a claim for "prospective injunctive relief." *Id.*

Even in those cases where a plaintiff's delay does not make out a defense of laches, delay is relevant in assessing irreparable harm. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir.1995). "Delay ... undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602 (S.D.N.Y.1979). While a showing of likely confusion can create a presumption of irreparable injury, proof of the plaintiff's unexplained delay can rebut that presumption. *Tom Doherty*, 60 F.3d at 39.

■ Sunquest's delay in filing this lawsuit does not rebut the presumption that it suffers from irreparable harm. The record in this case shows that Sunquest did not know about the severity of the infringement of its trademark until its lawyers completed their investigation of the issue in May of 2000. Soon thereafter, Sunquest filed the complaint in this action, accompanied by a motion for preliminary injunction. As the Second Circuit stated in *Tom Doherty*, "a delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the infringement is." *Tom Doherty*, 60 F.3d at 39. Although officials at Sunquest clearly had received documents containing the infringing mark in 1999, these same officials were not aware that Park City was a competitor until the beginning of 2000. I will not punish Sunquest for failing to sue at a time when it had no idea about the scope or the severity of Park City's infringement. "[P]arties should not be encouraged to sue before a

practical need to do so has been clearly demonstrated." *Playboy Enterprises v. Chuckleberry Publishing*, 486 F.Supp. 414, 434–35 (S.D.N.Y.1980).

Further, once Sunquest realized that Park City was using an infringing logo, it acted as a responsible litigant should. Sunquest immediately hired lawyers to investigate the matter and advise it on how to proceed. Once Sunquest was advised that it had a number of claims against Park City, it filed the instant action. As the Second Circuit explained in *Tom Doherty*, "a delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm." *Tom Doherty*, 60 F.3d at 39.

Accordingly, I reject defendant's argument and conclude that plaintiff has shown that it will suffer from irreparable harm unless a preliminary injunction is issued in this case.

### C. Harm to Defendants

■ In deciding whether injunctive relief is appropriate, the third task that the court must undertake is to determine whether the defendant will suffer irreparable harm if the preliminary injunction is issued. *Pappan Enterprises*, 143 F.3d at 803. This factor is sometimes referred to as balancing of the equities between the parties. *Opticians Association*, 920 F.2d at 197. "A basic purpose behind the balancing analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner." *Id.* Park City makes essentially two arguments about how it will be harmed if an injunction is issued in this case. First, it claims that it will be "subject to large expenses to change brochures and advertising." Dkt. no. 17, ¶ 81. Second, it claims that "its ability to integrate the company and its relationships with consumers would also be damaged." *Id.* ¶ 82. Neither argument is sufficient to overcome the irreparable harm that Sunquest will suffer if a preliminary injunction is not issued in this case.

Park City's first claim of damage is insufficient to constitute irreparable harm. To be sure, Park City will suffer financial injury if it is forced to cease using its corporate logo. The company will have to change its web site, its business cards, and its brochures. (6/20 Tr. at 180–81). In addition, the money that it has expended in promoting its corporate logo will be for nought. *Id.* at 183–84. Nevertheless, these money damages do not constitute irreparable harm. Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Association*, 920 F.2d at 195. The evidence presented at the hearing in support of this claim is that money can, indeed, atone for Park City's loss. For instance, when asked if Park City "would be damaged if it was forced to cease using this logo," (6/20 Tr. at 184), Park City's CEO Terry Pitts did not hesitate before he responded: "[i]t would cost us a lot of money to change." *Id.* Such damage does not constitute the kind of harm that would prevent the issuance of an injunction.

Park City's second argument is stronger, but not sufficient to prevent the issuance of an injunction in this case. In particular, Park City argues that, if an injunction is issued, "its ability to integrate the company and its relationships with consumers would also be damaged." Dkt. no. 17, ¶ 82. Over the past year, Park City has started to actively acquire companies and expand the use of its corporate logo. Park City's CEO, Terry Pitts, explained the importance of the Park City logo to this process:

> We have spent an awful lot of time and effort to rally around an icon and to rally around an image, and this has been one of the most difficult tasks that I have as president and CEO of the organization, is the integration of these companies and to give them a feeling of belonging and bringing together.

> And to the extent that we would have to change the logo and disrupt the efforts that have been done to date, yes,

that would injure the efforts to date, and would damage any efforts that we've expended to this time.

(6/20 Tr. at 185). At another point during the hearing, Pitts stated that the integration process takes somewhere between a "year to eighteen months," *id.* at 178, after which time the purchased entity's logo is eliminated and the Park City logo is the only one remaining. *Id.*

I find little in these facts to suggest that Park City will be irreparably harmed if I issue a preliminary injunction in this case. Half of the companies now owned by Park City were purchased during or after December 1999. If the process of associating the new entity with the Park City logo is a period that lasts from a year to eighteen (18) months, as Mr. Pitts stated during the hearing, then this process is not yet completed for any of these companies. In addition, Kelltech, a company just purchased by Park City in May 2000, has barely begun the integration process according to the time frame established by Mr. Pitts during the hearing. If these companies had been working solely under the Park City logo for a significant period of time, Park City might have a valid claim that it would be irreparably harmed by the issuance of an injunction. But the facts do not support such an inference. There can be little damage in forcing Park City to cease using its logo in an integration process that is only in its nascent stages.

Additionally, Park City can hardly claim that it will be harmed when it brought upon itself any difficulties that will result from the issuance of a preliminary injunction. *Opticians Association*, 920 F.2d at 197 (holding that defendant was not harmed when it openly, intentionally, and illegally appropriated the plaintiff's mark); *Processed Plastic Co. v. Warner Communications*, 675 F.2d 852, 859 (7th Cir.1982) (after a company intentionally copied a toy car, that company did not suffer hardship because it "cannot now complain that having to mend its ways would be too expensive"). Based on my findings that Park

City sought to closely align itself with Sunquest, including with Sunquest's logo, Park City cannot now claim that it would suffer harm by being forced to right the wrong that it committed.

When balanced against the damage that Sunquest will endure if the injunction is not issued, the damage suffered by Park City is almost non-existent. Park City has been in existence for approximately a year and a half. Although it has used its logo for that entire time, it has only started to use the logo on a nationwide scale over the past year. In contrast, for more than twenty (20) years, Sunquest has continuously used its sun and mountains logo. (6/19 Tr. at 39–44). It has expended millions of dollars advertising and promoting its mark. (*Id.* at 43–45; 6/20 Tr. at 101; Pl.'s Ex. 4). Based on this extensive use, Sunquest's customers and prospective customers associate the logo with Sunquest. (6/20 Tr. at 106). In fact, Sunquest's logo is easily identifiable to those in the health care information systems market. (6/19 Tr. at 39). When that logo is usurped by another entity, however, it creates confusion in the marketplace and diminishes Sunquest's control over its reputation and goodwill. *Opticians*, 920 F.2d at 195–97. Sunquest will continue to suffer this kind of harm unless a preliminary injunction issues. Park City has presented no evidence that an injunction will cause it the same kind of damage.

Therefore, I conclude that Park City will not suffer irreparable harm if an injunction is issued in this case, and that the equities favor the granting of a preliminary injunction.

### D. The Public Interest

My final task is to decide whether the public interest will be harmed if a preliminary injunction is granted. *Opticians Association*, 920 F.2d at 197. "Public interest can be defined in a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Id.* I have already concluded that there is a likelihood of confusion created by the concurrent use of the Park City and Sunquest logos. Accordingly, I conclude that the public interest supports the granting of a preliminary injunction.

### III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, I conclude that plaintiff Sunquest has satisfied all four elements for the granting of a preliminary injunction on its claim of trademark infringement under 15 U.S.C. § 1114. Consequently, I will grant Sunquest's motion for a preliminary injunction and enjoin defendant Park City Solutions from using its corporate logo during the pendency of this proceeding.